Original
No. 88-260

PETITION OF JANE DOE
(New Hampshire Division for Children and Youth Services)

October 6, 1989

*New Hampshire Legal Assistance*, of Manchester (*Ronald B. Eskin* on the brief and orally), for the petitioner.

*John P. Arnold*, attorney general (*Charles T. Putnam*, assistant attorney general, on the brief and orally), for the Division for Children and Youth Services.

BATCHELDER, J. Jane Doe petitions this court for a writ of certiorari to reverse a "fair hearing" decision by the New Hampshire Department of Health and Human Services, Division for Children and Youth Services (DCYS), finding that she abused

her young son on two separate occasions. On the facts and record of this case, we reverse the decision of the DCYS.

This case requires us to determine whether DCYS proved that Jane Doe committed child abuse, as that term is defined by RSA chapter 169-C, the Child Protection Act and Reporting Law. A brief review of the statute provides the backdrop for this case. The overall purposes of this law are to provide protection to children whose life, health, or welfare may be endangered and to assist parents to contend with, and to correct, family problems in order to avoid having children removed from the family. RSA 169-C:2, I (Supp. 1988). To effect the law's purposes, RSA 169-C:29 (Supp. 1988) requires that physicians, psychological therapists and teachers, among others, "having reason to suspect that a child has been abused or neglected" report such circumstances to the bureau of child and family services (bureau) within DCYS. Once the DCYS bureau receives a report of abuse or neglect, it must undertake an investigation within seventy-two hours, RSA 169-C:34, I (Supp. 1988), to determine: (1) the composition of the child's family or household; (2) whether probable cause exists to believe that any child in the family is abused or neglected, "including a determination of harm or threatened harm to each child, the nature and extent of present or prior injuries, abuse or neglect, and any evidence thereof," as well as a determination of the persons responsible for the abuse; (3) the immediate and long-term risk to the child if he or she remains in the existing home environment; and (4) the protective treatment and ameliorative services necessary to prevent further abuse or neglect, and to improve the home environment and the parents' ability to care for the children, RSA 169-C:34, II (Supp. 1988).

One aspect of the bureau's investigation, as noted above, is to decide whether probable cause exists to believe that a child is being abused. The bureau may find probable cause when it possesses knowledge of such "facts and circumstances based upon accurate and reliable information, including hearsay, that would justify a reasonable person to believe that a child ... is abused or neglected." RSA 169-C:3, XXIII (Supp. 1988). The statute expansively defines an abused child as one who has been: "(a) Sexually abused; (b) Intentionally physically injured; (c) Psychologically injured ...; or (d) Physically injured by other than accidental means." RSA 169-C:3, II (Supp. 1988). Upon finding probable cause that the child has been abused, DCYS may petition the district court, RSA 169-C:7 (Supp. 1988), to obtain protective orders for the child, including an order removing the child from the home, RSA 169-C:16, :19

(Supp. 1988). Whether or not probable cause is found, each instance of reported abuse is entered into a central registry. RSA 169-C:35 (Supp. 1988). Unfounded reports, those for which probable cause does not exist, RSA 169-C:3, XXVIII (Supp. 1988), are kept in the registry for three years. Founded reports are retained for seven years. RSA 169-C:35 (Supp. 1988). According to one national study, only forty percent of all child abuse reports are substantiated; the rest are investigated and dismissed. Besharov, *Child Abuse and Neglect Reporting and Investigation: Policy Guidelines for Decision Making*, 22 FAMILY L. Q. 1, 12 (1988).

When the DCYS finds probable cause to believe abuse has occurred, the alleged child abuser has a due process right to notice of that finding and a hearing to challenge that determination. *Petition of Bagley*, 128 N.H. 275, 287, 513 A.2d 331, 339–40 (1986). It is from the decision after such a hearing, called a "fair hearing" by the department of health and human services, that Jane Doe petitions this court. With this statutory and procedural background in mind, we analyze the facts of this case.

Jane Doe is a single, working mother. Her son John was born on March 15, 1984. When John was about twenty-one months old, in December, 1985, his mother hit him in the area of the mouth because, during mealtime, John persisted in throwing food. This punishment cut John's lip, causing it to bleed and swell. The swelling subsided within an hour, according to Jane. Concerned about her actions, Jane told the therapist she was seeing at the time, Sheila Renaud-Finnegan, about the incident. Renaud-Finnegan told Jane that she would have to report the incident to DCYS, and the therapist did so on December 23, 1985. In January, 1986, a DCYS investigating social worker, Judy Malcolm, spoke with Jane about the event. Jane described the circumstances to Malcolm and told her she was working with a counselor. Malcolm determined that the child abuse report was "founded, problem resolved," a designation which resulted in Doe's name being entered into the central registry, but requiring no further intervention by the DCYS because the problem "has been resolved to the Division's satisfaction or a satisfactory referral to another community resource has been made." N.H. ADMIN. RULES, He-C 6426.01(n).

On May 18, 1987, about seventeen months after the first incident, Jane again hit her son. This time, she and John had returned from grocery shopping at 9:00 p.m., after Jane had put in a day's work. Upon being told he had to go to bed, John had a temper tantrum. When Jane instructed him to stop, he swore at her. Jane then slapped John with the back of her hand, hitting him in the temple

area. The slap left a bruise on John's temple, which lasted approximately two and one-half days. Jane was wearing a ring at the time, a factor which may have contributed to the bruise.

At John's day-care center the next day, a worker noticed the bruise on his temple. The worker called Jane to discuss the bruise, and Jane admitted striking John. The day-care center notified DCYS's Malcolm of the incident on May 20. That same day, Malcolm interviewed John at the day-care center and photographed his bruise. Malcolm left a message at the day-care center, requesting Jane to call her. Sheryl Fair, Malcolm's supervisor, reviewed notes of the reported abuse and wrote a note to Malcolm. In the note, Fair listed several factors—John's age, the location of the injury, Jane's denial of previous abuse, the failure of "prior safety factors," an "uncontrollable" mother—leading her to conclude that the situation "looks very serious" and instructing Malcolm to "consider placement here."

On May 21, Jane telephoned Malcolm and discussed the incident. In their conversation, Jane claimed it was the first time she had hit John, until Malcolm refreshed her memory about the December, 1985 incident. Jane also said that John was not a behavior problem at home, a fact which contradicted Malcolm's information about John's aggressive behavior at the day-care center. At Malcolm's suggestion, Jane agreed to renew counselling, which she had ended more than a year earlier.

On May 28, 1987, Malcolm met with Jane and told her that she needed counselling to help her deal with her son. On June 12, 1987, Malcolm wrote to Jane, reiterating her concern and offering to help Jane find a therapist. On June 23, 1987, Malcolm again wrote to Jane about obtaining counselling and threatened to take legal action if Jane had not given her the name of her chosen therapist. At some point, Jane contacted a mental health center about its services but was told that weekly sessions would cost forty dollars more than her insurance would cover. Given her weekly net salary of $150, she could not afford such counselling.

On July 8, 1987, Malcolm was informed of another red mark on John's body, this time on his neck. John gave conflicting explanations of how he got the red mark, including that his mother had caused the mark. Jane strongly denied causing the mark on her son's neck. On August 21, 1987, Malcolm designated Jane's case as "opened for protective services," a term which, according to DCYS regulations, is used to refer to all of the social services that can be provided to prevent or remedy, *inter alia*, child abuse. N.H. ADMIN. RULES, He-C 6426.01(z). By letter dated September 8, 1987,

DCYS sent Jane notice that they had found reason to believe that she had abused her son on both May 18 and on July 7, 1987. The notice also referred to the case of founded abuse involving the December, 1985, incident.

Jane timely requested a fair hearing, see N.H. ADMIN. RULES, He-C 6201.01(i) (fair hearing is an administrative forum in which impartial decision-maker hears evidence on DCYS action or inaction), on the findings of abuse. The fair hearing was conducted by Dagny Fecht, the hearing officer, and Elizabeth Linsky, the panel expert, on March 24, 1988. In addition to the testimony of Jane Doe and Judy Malcolm, from which the facts recited above were elicited, the hearing officer received a letter from Dr. Thomas C. Bisett, John's pediatrician, describing his October 9, 1987 examination of the boy. Dr. Bisett's letter noted that John's medical record did not indicate a pattern of repeated office visits because of injury, and that regularly scheduled appointments had been kept. In addition, the letter noted that no visible evidence disclosed recent injury, that a series of long bone films ruled out recent and old bone injury, and that John's blood tests, taken because of his mother's claims that he bruised easily, showed results within normal limits. Dr. Bisett concluded his letter by stating that he did "not find a history suggestive of, nor a current situation consistent with, child abuse for John."

Jane Doe also offered the testimony of Dr. Wilfred Derby, a clinical psychologist. Dr. Derby testified to the difficulty in drawing a line between child abuse and acceptable forms of corporal punishment, as well as the differences among various authorities as to what actions constitute abuse. He also testified about two tests, the Adult/Adolescent Parenting Inventory (AAPI) and the Parenting Stress Inventory (PSI), used to assess young parents' inclination toward child abuse. Dr. Derby administered both of the tests to Jane in January, 1988. On the AAPI, Jane scored slightly below the average range on her willingness to consider alternatives to corporal punishment, but not within the range indicating a high potential for abuse. She scored average or above on the other indicators. On the PSI, used to assess the interaction between the parent and the child and the parent's perception of the child, Jane scored within normal ranges for all behaviors, except that she is depressed. Dr. Derby concluded that John was not an abused child, since he found, *inter alia*, that the incidents at issue were isolated and did not require medical attention. According to the definition of abuse he used, if an injury does not require medical attention, the definition is not met.

The other testimony in the fair hearing came from Sheryl Fair, the DCYS supervisor who made the determination of abuse in this case. Fair, who has nearly thirty years experience in dealing with child abuse, stated that John was at moderate risk because of his age, the bruise on his temple, a young single mother who loses control, and the mother's inability to identify precipitating factors. To make a determination of risk, DCYS policy provides for the use of a risk matrix. Fair was unsure whether she relied upon the risk matrix in reaching her conclusion that John was at moderate risk.

At the hearing, the parties agreed that the July, 1987, bruise would not be at issue because the reporter of the alleged abuse may have tainted the investigation by questioning the child improperly. Thus, only the December, 1985, and May, 1987, incidents were relevant; and, as to those, the hearing officer, Dagny Fecht, came to the following conclusions. The testimony of Dr. Bisett was minimized, noting that he had examined John months after the May event had occurred and that the absence of recorded office visits because of injury was negated by Jane's failure to get medical attention for the two incidents at issue. From Dr. Derby's testimony, Fecht concluded that Jane "is depressed, has low attachment, suffers from social isolation and ... is living on [sic] a highly stressful situation...." The officer thus found, despite Jane's argument that she made two mistakes in administering corporal punishment, that the cut lip and temple bruise "were not caused by accidental means but rather the result of a deliberate blow to John on each occasion...." Fecht concluded that these acts constituted physical abuse, threatening harm to the child's health and welfare.

In her petition to this court, Jane contends that the fair hearing officer improperly found child abuse under RSA 169-C:3, II(d) (Supp. 1988) because DCYS presented no evidence to show that Jane harmed John's health or welfare. Alternatively, Jane argues that even if the statute was applied properly, such an application violated her constitutional right to privacy under the State and federal due process clauses, and also violated the supremacy clause of the United States Constitution. We agree with the petitioner that a literal reading of RSA 169-C:3, II (Supp. 1988) as applied in this case may have constitutional implications, *see In re Fay G.*, 120 N.H. 153, 156, 412 A.2d 1012, 1015 (1980) ("the family and the rights of parents over it are fundamental and inherent within the federal and our own State constitutions"), but we need not address the constitutional issues, as we decide this case on statutory grounds.

■ Our review on certiorari of the fair hearing decision requires us to determine whether the agency "has acted 'illegally in respect to jurisdiction, authority or observance of the law ... or has abused its discretion or acted arbitrarily or capriciously.'" *In re Doe*, 126 N.H. 719, 722–23, 495 A.2d 1293, 1296 (1985) (quoting *State v. Brackett*, 122 N.H. 716, 718, 449 A.2d 1210, 1212 (1982)). The petitioner's essential argument is that a finding of abuse under the Child Protection Act, RSA chapter 169-C, requires more than a showing that a child has been injured by other than accidental means. Rather, it requires evidence that the child's health or welfare has been or will be harmed. As support for this position, the petitioner notes that the statute's definition of abuse focuses on the child's condition, not the single acts of parents. Further, she points out that for each instance of reported abuse, DCYS's initial investigation must include "a determination of harm or threatened harm to each child" in the family of the person suspected of abusive behavior. RSA 169-C:34, II(ii) (Supp. 1988). Unless such a determination is incorporated in the definition of an abused child, she argues, the statute is vague and gives DCYS too much discretion to bring the power of the State to bear on the appropriateness of parental disciplinary choices. Finally, the petitioner asserts that the legislature, by statute, has permitted parents to use reasonable force to control their children without incurring criminal liability, RSA 627:6, and DCYS's interpretation of child abuse conflicts with that statute.

In response, DCYS maintains that the statutory definition of child abuse is clear and should be interpreted according to its plain meaning. DCYS states that John suffered two non-accidental injuries caused by his mother. These injuries thus bring John within the definition of an abused child, which in turn permits DCYS to determine the protective treatment and administrative services necessary to improve the home and prevent further abuse. Further, DCYS contends that its interpretation is entirely consistent with the goals and purposes of the child protection statute, contrary to the petitioner's argument otherwise. Finally, DCYS argues that its interpretation of the definition of child abuse does not conflict with RSA 627:6, because that statute permits only the reasonable use of force, which does not include twice bruising the head of a child under three years of age.

■ To resolve the statutory arguments, principles of statutory interpretation require us to look first to the statutory language itself, *In re John Kevin B.*, 129 N.H. 286, 288, 525 A.2d 281, 282–83 (1987), and to construe the law in a manner consistent with

its plain meaning, when possible, *Theresa S. v. Sup't of YDC*, 126 N.H. 53, 55, 489 A.2d 592, 593 (1985). To divine the intent of a statute, we will determine its meaning from its construction as a whole, not by examining isolated words and phrases. *Town of North Hampton v. Sanderson*, 131 N.H. 614, 557 A.2d 643 (1989). With these canons of statutory interpretation as guides, we address the arguments of the parties.

We agree with the petitioner's argument that RSA 169-C:3, II(d) (Supp. 1988) requires more than proof of two incidents, spaced approximately one and one-half years apart, which resulted in a swollen lip and a bruise on the head. Although DCYS is correct in stating that the plain meaning of the statutory definition of child abuse—to be "physically injured by other than accidental means"—could be interpreted literally to include the minor injuries caused here, such an interpretation is overly broad and could encompass reasonable forms of corporal punishment that do not threaten the well-being of the child. Moreover, such an interpretation conflicts with the language throughout RSA chapter 169-C which emphasizes harm to the health or welfare of the child. *E.g.*, RSA 169-C:2, I (Supp. 1988) (purpose of this chapter is "to provide protection to children whose life, health, or welfare is endangered"); RSA 169-C:3, XIX(b) (Supp. 1988) (neglected child defined in part as a child without proper parental care or control "necessary for his physical, mental, or emotional health, when it is established that his health has suffered or is likely to suffer serious impairment"); RSA 169-C:3, XXVII-a (Supp. 1988) (sexual abuse defined as certain activities under circumstances indicating "that the child's health or welfare is harmed or threatened with harm"); RSA 169-C:34, II (Supp. 1988) (child protective investigation must include "a determination of harm or threatened harm to each child"); *see also* 42 U.S.C.A § 5106g(4) (West Supp. 1988) (federal definition of child abuse includes physical injury inflicted "under circumstances which indicate that the child's health or welfare is harmed or threatened thereby").

We do not lightly interpret a statute so as to impose a requirement that does not appear on its face. Nevertheless, given the facts of the case, and reviewing the definition of child abuse in light of the statute as a whole, we conclude that a proper finding of child abuse under RSA 169-C:3, II(d) (Supp. 1988) must include a determination of whether the alleged abusive act was committed under circumstances indicating harm or threatened harm to the child's life, health, or welfare. Such harm may be demonstrated by, for example, the severity of the intentionally inflicted injuries;

recurring or a threat of recurring injury; or injury when a profile of the child's caretaker indicates a history of, or a propensity for, abuse. These examples are in no way intended to be limiting, as we recognize the myriad situations in which harm or threatened harm may exist.

■ In reaching the conclusion we do, we emphasize that we are aware of the difficult duties the department of health and human services has in carrying out its responsibilities to protect children in abusive or potentially abusive situations. We are cognizant that there may be instances where two incidents, or even a single one, may properly be considered abuse under the statute. In many cases, the abuse will be all too evident and clear. We are not faced with such a situation in this case, however. The record reveals that Jane Doe struck her child on two occasions, cutting a lip and causing it to swell briefly for an hour, and then, about eighteen months later, striking his head with the back of her hand and leaving a bruise on his temple. DCYS concedes that both injuries were minor. The expert witnesses at the fair hearing concluded that Jane was not an abusive mother, and that John was not an abused child. DCYS presented no evidence, other than evidence concerning the two incidents, to counter the experts' testimony. DCYS failed to offer any facts to show that John's life, health, or welfare was harmed, or would be threatened with harm, by his mother's actions. On such a record, in a case where difficult lines between corporal punishment and child abuse must be drawn, we hold that the findings of abuse must be reversed.

*Reversed.*

All concurred.