Hillsborough
No. 90-533

*In re* ETHAN H.

June 25, 1992

*John P. Arnold*, attorney general (*David S. Peck*, senior assistant attorney general, on the brief and orally), for the State.

*Judith H.*, by brief and orally, *pro se.*

JOHNSON, J.  The respondent, Judith H., appeals from a Superior Court (*Groff*, J.) order finding that her son is an "abused child" under the Child Protection Act, RSA chapter 169-C. We reverse.

. The respondent, a physician, is the mother of four children. On May 1, 1988, she observed her seven-year-old son, Ethan, throwing food at the dinner table. When she commanded Ethan to behave, he allegedly ignored her. In response, she took Ethan to a bedroom and struck his bare buttocks approximately six times with an imitation leather belt.

The next day, the local elementary school reported to the New Hampshire Division for Children and Youth Services (DCYS) that it had received an anonymous phone call that Ethan may have been struck by his mother. The DCYS immediately began to investigate the matter. On May 3, a social worker entered the respondent's home pursuant to a court order. She interviewed Ethan and observed several bruises on his lower back. Ethan admitted that his mother had struck him and that he had additional bruises on his buttocks.

Based on the social worker's observations, the District Court (*Gauthier*, J.) ordered on May 5 that Ethan be placed in protective supervision of the DCYS and "be immediately medically examined to document the physical injuries." Accordingly, the social worker took Ethan to the Nashua Memorial Hospital where he was examined by Dr. David Walker. According to Dr. Walker's affidavit, "Ethan . . . had bruises on his buttocks, lower back and a bruise and scrape on his right abdominal wall." Dr. Walker also recalls telling the social worker that, based on Ethan's condition, he "would have never thought that Ethan was abused." He later told the State's attorney that he "would *not* have suspected abuse nor filed a report as mandatory by law." (Emphasis added.)

The DCYS nonetheless proceeded with its investigation. On June 8, 1988, the District Court (*Howorth*, J.) conducted a hearing to determine whether Ethan was an "abused child" under the Child Protection Act. RSA 169-C:3, II defines an "abused child" as:

"any child who has been:

(a) Sexually abused; or

(b) Intentionally physically injured; or

(c) Psychologically injured so that said child exhibits symptoms of emotional problems generally recognized to result from consistent mistreatment or neglect; or

(d) *Physically injured by other than accidental means.*"

(Emphasis added.) The district court found that "[Ethan] has incurred physical injury by other than accidental means within the meaning of RSA 169-C:3[,] II(d)."

The respondent appealed to the superior court for a *de novo* review pursuant to RSA 169-C:28. On December 20, 1988, the superior court conducted a hearing in which the DCYS called the respondent, the social worker, and Dr. Rantan Dandekar to testify.

On direct examination, the respondent admitted that Ethan's bruises were the result of corporal punishment. She also stated that she had previously "spanked" her children when she felt it was "judicious" and "proper." The remainder of the respondent's testimony regarded the facts surrounding the DCYS investigation. In questioning the respondent, the DCYS attorney made no attempt to establish whether Ethan was harmed or injured as a result of the blows. At the conclusion of the respondent's testimony, however, the trial court asked her whether Ethan cried upon being spanked, and she responded that he did cry.

Next, the DCYS called the social worker, who testified regarding her investigatory findings. The social worker recalled that "Ethan said that he received all [his bruises] from his mother hitting him with the belt." The social worker also recalled the respondent's statement that she "couldn't guarantee . . . that she wouldn't hit any of her children, including Ethan, with a belt [in the future]" and that "if Ethan had done something that she felt permitted using the belt, then she would use the belt." The DCYS attorney never asked the social worker whether in her opinion Ethan's bruises indicated harm or injury.

Finally, the DCYS called Dr. Dandekar to the witness stand. Dr. Dandekar testified that on May 6, the day after Dr. Walker examined Ethan on behalf of the DCYS, the respondent, apparently unaware of Dr. Walker's assessment of Ethan's bruises, had on her own initiative sent Ethan to Dr. Dandekar's office for an independent examination. Dr. Dandekar recalled that Ethan "had a bruise over his right thigh," "linear bruise[s] on . . . the right and left buttock," a "bruise

which was just over the iliac crest," and a "healing abrasion" at "the point where the bottom and the stomach area meet." The DCYS never established whether this "healing abrasion" arose from the mother's punishment. Dr. Dandekar also testified that, based on the above observations, she would report the bruises to the DCYS because "by law [she was] supposed to report any non-accidental *bruises*." (Emphasis added.) The DCYS attorney did not ask Dr. Dandekar whether she observed any signs of harm or injury in treating Ethan; nor did the attorney ask Dr. Dandekar whether, in her professional opinion, the bruises themselves indicated harm or injury.

The DCYS presented no other testimony. Most notably, it did not call Dr. Walker, the physician who examined Ethan on behalf of the DCYS. As noted earlier, Dr. Walker signed an affidavit stating that he "would have never thought that Ethan was abused."

The respondent also presented three witnesses at the December 20 hearing. First, a lifelong friend testified that she had never observed any evidence of abuse in the respondent's relationship with her children. She also responded to the respondent's questions on redirect examination in the following manner:

"Q. What's been the standing joke about me and my kids with pretty well everybody as far as bruising goes?

A. Well, you just touch them and they're bruised.

Q. I used to yell at you when we lived together; isn't that right?

A. Uh-huh.

Q. Don't squeeze my arm, that will leave a huge bruise?

A. Uh-huh.

Q. Was that the standard thing among all our friends?

A. Very easily bruised, yes."

The DCYS attorney did not cross-examine the respondent's friend regarding the above testimony.

The respondent next called her sister, also a physician, who was sharing her home with the respondent's family at the time of the incident. The sister testified that the respondent "has a very strong attachment to her children" and is "a very, very concerned and loving mother." She also recalled that after Ethan was struck by his mother, he "was out . . . playing and running around and didn't appear to be injured in any way." She continued:

"Ethan was as active as ever. Basketball. He was out running around and playing with his friends. There was absolutely no difference in his demeanor, saying he was sore when he sat down or that he hurt or anything like that. He was completely as normal as he always is."

On cross-examination, the DCYS attorney did not question the sister regarding her observations of Ethan. Instead, the attorney cross-examined her regarding Ethan's bruises (the presence of which had already been established by three other witnesses including the respondent). In response, the sister stated, "These children bruise very easily and they have numerous bruises on them at any given time from playing, going out in the woods, riding their bicycles, just roughhousing among themselves."

Finally, the respondent took the witness stand on her own behalf. She testified regarding, among other things, her philosophy on corporal punishment:

"I believe corporal punishment, when done judiciously and appropriately for the situation and for the circumstances is a definite form of punishment. It's not the one people would ever use initially. I mean, you know, to strike out constantly at children and/or to use that as your only form of discipline would be ludicrous. But what I'm saying to you is that the circumstances warranted it. And you know your child and you know the situation. There are times when it can be appropriate."

The superior court upheld the district court's finding that Ethan was an "abused child." The respondent then appealed to this court. We remanded for reconsideration in light of our then-recent decision in *Petition of Doe*, 132 N.H. 270, 564 A.2d 433 (1989), and the superior court conducted a second hearing on October 5, 1990.

The DCYS presented no witnesses at the second hearing. The respondent, however, called three witnesses, including her father, a retired physician. His testimony concerned the relationship between pain, injury, and bruising. He opined that "[n]either bruising nor pain is a valid criteria [of determining injury]" and that "approximately 80 percent of the bruises that present at a doctor's office the patient has no idea how the bruises came [about]." He also explained that the buttocks is perhaps the safest area of the body upon which to administer corporal punishment. During an extremely short cross-examination covering only three pages in the trial transcript, the DCYS attorney did not significantly challenge the credibility of

the father's testimony. Moreover, the attorney presented no evidence rebutting his testimony.

As noted earlier, RSA 169-C:3, II(d) defines an "abused child" as "any child who has been . . . [p]hysically injured by other than accidental means." In *Petition of Doe*, we addressed the proper scope of RSA 169-C:3, II(d). We noted that the provision, if interpreted literally, "is overly broad and could encompass reasonable forms of corporal punishment that do not threaten the well-being of the child." *Petition of Doe*, 132 N.H. at 277, 564 A.2d at 438. We concluded that

> "a proper finding of child abuse under RSA 169-C:3, II(d) (Supp. 1988) must include a determination of whether the alleged abusive act was committed under circumstances *indicating harm or threatened harm to the child's life, health, or welfare*. Such harm may be demonstrated by, for example, the severity of the intentionally inflicted injuries; *recurring or a threat of recurring injury*; or injury when a profile of the child's caretaker indicates a history of, or a propensity for, abuse. These examples are in no way intended to be limiting, as we recognize the myriad situations in which harm or threatened harm may exist."

*Id.* at 277–78, 564 A.2d at 438-39 (emphasis added).

In its decision of October 15, 1990, the superior court applied the above standards to the evidence presented at both the 1988 and 1990 hearings and found that Ethan was an "abused child" under RSA 169-C:3, II(d). The court first looked to the dictionary meaning of the term "bruise" and concluded that "[a] bruise is most certainly, by its plain meaning, an injury." The court then reasoned that

> "[t]he decision in *Petition of Jane Doe* acknowledges that conduct causing minor injuries may constitute abuse if recurring injury or a threat of recurring injury is demonstrated. This is exactly the case here. [The respondent] intentionally struck her 6 year-old son with a belt across his bare buttocks about 6 times, causing linear bruises which were still visible after 5 days. Such 'strappings' had been occasioned to Ethan in the past as deemed required by his misbehavior . . . . [The respondent] also demonstrated her intent to continue to discipline her son in this manner in the future. On these facts, the Court finds that it has been established that the strapping of Ethan by [the respondent] was committed under circumstances indicating harm or threatened harm to the child's health and welfare. The Court finds

that Ethan has been abused by the conduct of [the respondent]."

■■ We will not reverse the superior court's findings "unless they are unsupported by the evidence or are erroneous as a matter of law." *State v. Westcott*, 134 N.H. 692, 695, 597 A.2d 1072, 1075, (1991). Upon reviewing the evidence presented at both the 1988 and 1990 hearings, we conclude that the superior court's finding that Ethan's bruises "indicat[ed] harm or threatened harm to [his] health and welfare" was unsupported by the evidence.

The respondent presented substantial evidence that Ethan, although bruised, was not harmed. First, her friend and sister both indicated that Ethan tended to bruise easily. Second, the sister indicated that Ethan was actively playing outside after the corporal punishment was administered. Third, the respondent's father testified regarding the tenuous relationship between bruising and harm. As noted earlier, the father's testimony went uncontroverted by any other professional witness. Indeed, the DCYS failed to present *any* testimony of its own indicating that Ethan was harmed or injured. This failure is stunning in light of the fact that the 1990 hearing occurred after this court remanded the matter for further consideration in light of *Petition of Doe*, the very case requiring "harm or threatened harm" for a finding of child abuse.

Additionally, the DCYS failed to present the testimony of Dr. Walker, *who examined Ethan on behalf of the DCYS*, at either hearing. In the absence of any showing to the contrary, we are left to presume that Dr. Walker was not called by the DCYS due to his opinion that he "would not have suspected abuse" based on Ethan's bruises.

■ Lastly, we note that neither in this case nor in *Petition of Doe* has this court been called upon to either condone or condemn the use of corporal punishment as a means of disciplining one's children. The legislature has already established as policy that *reasonable* corporal punishment is allowable. *See* RSA 627:6, I; *see also Petition of Doe*, 132 N.H. at 277, 564 A.2d at 438. This court's role is merely to determine if the acts alleged and found below, viewed in the light most favorable to the finder of fact, sustain a finding of "child abuse" within the meaning of RSA 169-C:3, II(d). Today, we hold only that the DCYS, by failing to establish that Ethan's bruises were indicative of harm or injury, has not established child abuse under the standards set forth in *Petition of Doe*. We recognize that in future cases a child's bruises may be of such a nature as to establish *prima facie* evidence of "harm or threatened harm."

■ Because we conclude that no child abuse exists in this case, it is not necessary for us to address whether the respondent was justified in "strapping" Ethan under RSA 627:6, I, which provides that "[a] parent, guardian or other person responsible for the general care and welfare of a minor is justified in using force against such minor when and to the extent that he reasonably believes is necessary to prevent or punish such minor's misconduct." This statute merely codified the "well-recognized precept of Anglo-American jurisprudence that the parent of a minor child or one standing *in loco parentis* was justified in using a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare." *Bowers v. State*, 283 Md. 115, 126, 389 A.2d 341, 348 (1978); *see also State v. Black*, 360 Mo. 261, 268, 227 S.W.2d 1006, 1010 (1950); *State v. Beins*, 235 Neb. 648, 652, 456 N.W.2d 759, 762–63 (1990); *State v. Thorpe*, 429 A.2d 785, 788 (R.I. 1981); *Carpenter v. Commonwealth*, 186 Va. 851, 860–62, 44 S.E.2d 419, 423–24 (1947).

Additionally, we need not address the constitutional issues raised by the respondent, since we decide this case on statutory grounds. *Petition of Doe*, 132 N.H. at 275, 564 A.2d at 437.

*Reversed.*

All concurred.