USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1537 JEAN R. KENERSON, ADMINISTRATRIX OF THE ESTATE OF VAUGHAN H. KENERSON, Plaintiff - Appellant, v. FDIC, ET AL., Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Keeton,* District Judge. ______________ _____________________ Cordell A. Johnston, with whom Bradford W. Kuster and Orr ____________________ __________________ ___ and Reno, P.A. were on brief for appellant. ______________ Irvin D. Gordon, with whom William D. Pandolph and Sulloway _______________ ___________________ ________ & Hollis were on brief for appellee Dean Witter Reynolds Inc. ________ Emily Gray Rice, with whom Broderick & Dean, P.A. was on _______________ _______________________ brief for appellees Bank of California, N.A. and Morgan Guaranty Trust Company. ____________________ January 5, 1995 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. KEETON, District Judge. This case arises from the ______________ fraudulent conduct of an attorney who forged check indorsements and absconded with a widow's money. The attorney, however, is not a party. Rather, the widow, appellant Jean Kenerson, suing in her capacity as administratrix of her deceased husband's estate, seeks to recoup her losses from the institution ("Dean Witter") that wrote the checks and the banks on which they were drawn. We use "plaintiff" (or "appellant") to refer to Mrs. Kenerson in her capacity as currently the administratrix and formerly co-administrator with the attorney. The trial court granted motions for summary judgment for all defendants. We affirm the judgment for Dean Witter, but vacate the judgment for other defendants and remand for such further proceedings, consistent with this Opinion, as may be necessary to final disposition. I. I. One week after the death of Vaughan H. Kenerson in July 1981, the Sullivan County Probate Court appointed Jean R. Kenerson and John C. Fairbanks as co-administrators of his Estate. Mrs. Kenerson, having limited experience in financial matters, including estate administration and investments, relied on Fairbanks' legal and investment counsel. She took little, if any, role in the Estate administration. In August 1981, Fairbanks opened an Estate checking account at First Citizens National Bank, listing himself as the sole authorized signatory. He also maintained a trust account -2- 2 for his law offices at the same bank. In November 1981, Fairbanks opened an account for the Estate with Dean Witter Reynolds, Inc., into which he placed stock holdings of the Estate valued at $248,660.87. Fairbanks did not inform Mrs. Kenerson of the existence of the Dean Witter account or of his withdrawals from it, totalling $255,978.38 between November 1981 and the closing of the account in October 1984. Fairbanks received the withdrawals in the form of checks that were mailed to him. Most of the checks were issued in the following manner: Pay to the order of Estate of Vaughan H. Kenerson Jean R. Kenerson & John C. Fairbanks Administrators On some checks, however, "Admin" instead of "Administrators" appeared on the last line. The checks were drawn on Dean Witter's accounts at Morgan Guaranty Trust Company and Bank of California. Fairbanks deposited one of the Dean Witter checks, in the amount of $150,000, in his own account at First Citizens National Bank. He deposited the other checks in the Estate checking account that he had opened at First Citizens National Bank. Fairbanks indorsed these checks by writing first his own name (without any description of his role), followed by the name of Mrs. Kenerson. No evidence was offered at trial that Mrs. Kenerson had ever affirmatively authorized Fairbanks to indorse any checks in her name. In each instance, First Citizens National Bank, the -3- 3 depository bank, accepted the check and transmitted it to the drawee bank -- Morgan Guaranty Trust or Bank of California ("Banks") -- and the drawee bank paid the check. Though the record is not explicit, the parties appear to have assumed, and we take it to be undisputed, that in each instance the drawee bank charged Dean Witter's account. Fairbanks withdrew from the Estate bank account, for his own benefit, all but a small portion of the funds in that account. Mrs. Kenerson acknowledged receiving only $20,000. In any event, appellees do not contend that she received any more than $66,000. Beyond this sum, little if any of the remaining funds from the Estate account with First Citizens National Bank were disbursed in any way that inured to Mrs. Kenerson's benefit, either individually or in her capacity as co-administrator. II. II. Plaintiff did not sue the most obvious target, Fairbanks; he had disappeared. Instead she sued Dean Witter, drawer of the checks, and Morgan Guaranty Trust and Bank of California, drawees (or payors) of the checks. (Plaintiff initially sued the depositor bank, too, but claims against the F.D.I.C., as that bank's successor in interest, were dismissed by stipulation.) Plaintiff sued Dean Witter on the theory that it was still liable to her on the checks because she had received only a small portion of their value and, in her capacity as co- -4- 4 administrator and later sole administratrix, was entitled to recover a sum equal to the remainder of the full value. She sued the drawee Banks on the theory that they had converted the proceeds of the checks when they paid them over the forged indorsements of her name. Plaintiff sued all defendants -- the drawer (Dean Witter) and drawees (the Banks) -- on two different theories. The trial court, in granting summary judgment to all defendants, relied, essentially, on one proposition -- that under the U.C.C. (as enacted in New Hampshire) and the common law (as developed in New Hampshire) all defendants were entitled to rely on Fairbanks' indorsement when paying on the checks he forged. The trial court read the checks as payable to the Estate. Based on this reading, the court concluded that Fairbanks' negotiation of the checks -- by his own indorsement and the forged indorsement in plaintiff's name -- absolved defendants of liability to plaintiff. We conclude that the trial court's reasoning rested on an impermissible reading of the checks and that the rules of law invoked by the trial court do not apply to the checks at issue in this case. We assume, without deciding, that, in general, a determination as to who are the payees of an instrument may be one of fact if on the evidence received, under the applicable law, reasonable finders of fact could differ. Cf. Feldman ___ _______ Construction Co. v. Union Bank, 104 Cal. Rptr. 912, 913 (Cal. ________________ __________ App. 1972) (referring to "trial court's findings of fact and -5- 5 conclusions of law that the check was payable jointly to two payees and required the endorsement of both"). We agree with the district court that, on the evidence before the court in this case, factfinders can not reasonably differ as to the proper reading of the instruments at issue, and therefore the determination of the meaning of those instruments must be made by the court "as a matter of law." Contrary to the determination of the trial court, however, we conclude that the only reasonable construction of the checks at issue in this case is that they were payable to plaintiff and Fairbanks together (that is, collectively) as payees, in their capacities as administrators of the Estate.1 As we explain more fully below, under the statute and the applicable precedents, a check payable to two persons together (as distinguished from a check payable in the alternative, to either of two persons) can properly be negotiated only on the valid indorsements of both payees. Nevertheless, as explained in Parts III and IV below, because Fairbanks had authority to receive the checks, even ___________ though he did not have authority to indorse them with plaintiff's __________ signature and then negotiate them, summary judgment for drawer  ____________________ 1 We have chosen to use the word "together," rather than "jointly," because the drafters of the U.C.C. expressly declined to refer to the payees of an instrument written in this way as "joint payees." The U.C.C. omitted the word "joint" because that term might be thought to carry a possible implication of a right of survivorship. New Hampshire R.S.A. 382-A:3-110, comment 1. No such implication is associated with our use of "collectively" and "together" in this Opinion. -6- 6 Dean Witter was appropriate, given that the Banks paid the checks and charged Dean Witter's account. This rule as to the drawer's discharge applies even when the payment is on a forged indorsement. It is, however, a rule as to a drawer's liability and does not apply to drawees. For this and other reasons, explained below, we vacate summary judgment for appellee Banks and remand for further proceedings. III. III. Plaintiff sued Dean Witter, drawer of the checks, on the ground that Dean Witter was liable to her on the instruments themselves. She brought her suit against Dean Witter under New Hampshire R.S.A. 382-A:3-804, which provides in relevant part: The owner of an instrument which is lost, whether by destruction, theft or otherwise, may maintain an action in his own name and recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms. Dean Witter did not dispute that plaintiff properly framed her action under this section. We assume, without deciding, that plaintiff sufficiently alleged a cause of action under 3-804. Dean Witter asserted that it was discharged from liability to plaintiff under R.S.A. 382-A:3-603(1), which provides in relevant part: The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument . . . . -7- 7 The trial court, relying on this clause, granted summary judgment for Dean Witter on the ground that Fairbanks was a holder and had received payment on the checks Dean Witter drew on defendant Banks. A. A. We review de novo the district court's determination that 3-603 applies, because the issue is one of law. See Salve ___ _____ Regina College v. Russell, 499 U.S. 225, 239 (1991) (courts of _______________ _______ appeals must review state-law determinations of district courts de novo). New Hampshire courts have not explicitly considered which U.C.C. provisions apply to instruments drafted precisely in the manner of the instruments in this case. Thus, in construing 3-603, as well as other statutes referred to later in this Opinion, we do not have the benefit of direct guidance from New Hampshire case law. We are guided, however, by principles of statutory interpretation that are well settled in New Hampshire law. We begin by considering the words of the statute, and on the assumption "that all words in [the] statute were meant to be given meaning in the interpretation of the statute," Town of ________ Wolfeboro v. Smith, 556 A.2d 755, 756-57 (N.H. 1989). We take _________ _____ account also of our obligation to determine manifested meaning of a statute "from its construction as a whole, not by examining isolated words and phrases." Petition of Jane Doe, 564 A.2d 433, ____________________ 438 (N.H. 1989). We conclude, in light of various provisions of the -8- 8 statute taken together, that payment to Fairbanks was not "payment . . . to the holder" for purposes of 3-603. Nonetheless, Fairbanks was an agent of plaintiff for some purposes, and was authorized to receive the checks on her behalf; therefore, under a rule of the common law that was not abrogated by enactment of the U.C.C. in New Hampshire, Dean Witter's delivery of the checks to Fairbanks, followed by the payment of the checks through the Banks, absolved Dean Witter of liability on the instruments. In all relevant respects, the New Hampshire statute mirrors precisely the Uniform Commercial Code. Our citations will be primarily to the New Hampshire Revised Statutes Annotated. References to the statute in the text of this Opinion, however, will be by section number alone. The New Hampshire statute, as well as the Uniform Commercial Code on which it is based, defines a "holder" as a person who is in possession of an instrument drawn, issued, or indorsed to him or to his order. R.S.A. 382-A:1-201(20).2 A  ____________________ 2 The text, in relevant part, of the statutory provisions considered here is as follows: Article 1 Article 1 GENERAL PROVISIONS GENERAL PROVISIONS . . . . 1-201 General Definitions. 1-201 General Definitions. . . . . (20) "Holder" means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or -9- 9  ____________________ to bearer or in blank. Article 3 Article 3 COMMERCIAL PAPER COMMERCIAL PAPER 3-110 Payable to Order. 3-110 Payable to Order. (1) An instrument is payable to order when by its terms it is payable to the order or assigns of any person therein specified with reasonable certainty, or to him or his order, . . . . It may be payable to the order of . . . . (e) an estate, trust or fund, in which case it is payable to the order of the representative of such estate, trust or fund or his successors; . . . . . . . 3-116 Instruments Payable to Two or More 3-116 Instruments Payable to Two or More Persons. An instrument payable to the order Persons. of two or more persons . . . . (b) if not in the alternative is payable to all of them and may be negotiated, discharged or enforced only by all of them. 3-117 Instruments Payable With Words of 3-117 Instruments Payable With Words of Description. An instrument made payable to a Description. named person with the addition of words describing him . . . . (b) as any . . . fiduciary [other than an agent or officer] for a specified person or purpose is payable to the payee and may be negotiated, discharged or enforced by him . . . . 3-202 Negotiation. 3-202 Negotiation. (1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery -10- 10 holder of an instrument has the power to negotiate or transfer it, or to discharge the instrument or enforce payment on it in his own name. R.S.A. 382-A:3-301. Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. R.S.A. 382-A:3-202(1). Negotiation of an instrument that is payable to the order of specific persons is accomplished by delivery of the instrument with all the necessary indorsements. Id. ___ It is undisputed that Fairbanks was in possession of the checks, and that the checks were drawn to him in his capacity as administrator. They were not drawn to him alone, however, but to him and plaintiff together in their capacities as  ____________________ with any necessary indorsement; if payable to bearer it is negotiated by delivery. 3-301 Rights of a Holder. The holder of an 3-301 Rights of a Holder instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in Section 3-603 on payment or satisfaction, discharge it or enforce payment in his own name. 3-603 Payment or Satisfaction. 3-603 Payment or Satisfaction. (1)The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument . . . . 3-804 Lost, Destroyed or Stolen 3-804 Lost, Destroyed or Stolen Instruments. Instruments. The owner of an instrument which is lost, whether by destruction, theft or otherwise, may maintain an action in his own name and recover from any party liable thereon upon due proof of his ownership, the facts which prevent his production of the instrument and its terms. -11- 11 administrators. Neither co-administrator, acting on his or her own, could negotiate the checks. Rather, the indorsements of both administrators were "necessary," as that term is used in 3- 202(1), to "negotiate[]" the checks as that term is used in 3- 116(b), according to which an instrument payable to two or more persons, if not in the alternative, is payable to all of them together and may be "negotiated" only by all of them. Plaintiff never indorsed the checks. Thus, Fairbanks did not properly negotiate the checks when he signed his indorsement, forged the indorsement of plaintiff, and delivered the checks to the depository bank. Consequently, Dean Witter's payment to Fairbanks on those checks did not constitute the "payment . . . to the holder" that results in discharge of a drawer's liability under 3-603. To conclude otherwise would be entirely inconsistent with 3-116(b), under which, as stated in a comment, "the rights of one [co-payee] are not discharged without his consent by the act of the other [co-payee]." See R.S.A. 382-A:3- ___ 116, comment. We need not, and do not, decide whether Fairbanks was a holder for any other purpose contemplated by the statute. Rather, we decide only that, in the circumstances of this case, under 3-603 Fairbanks was not a holder for the purpose of discharge of Dean Witter's liability when he received Dean Witter's payment through the drawee Banks. Similarly, because the checks were not properly negotiated by Fairbanks, the depository bank did not become a -12- 12 holder of the checks when Fairbanks delivered them to the bank. See R.S.A. 382-A:3-202(1). Thus, Dean Witter's payment to the ___ depository bank, through the drawee banks, also did not constitute payment to a holder under 3-603. As stated above, we conclude that the checks in this case were payable to the co-administrators together. It is true that the manner in which the checks were written is not one that falls squarely within an explicit provision of the statute. In these circumstances, we examine hypothetical variations, at least some of which are explicitly referred to in the statute. We do so with the purpose of considering which, among our hypothetical instruments, the instruments at issue here most closely resemble. Suppose, first, the checks had been made payable to "Estate of Vaughan H. Kenerson," without more. It might plausibly have been argued that under 3-110(1)(e) the indorsement of either of the co-administrators (that is, Fairbanks as administrator or Mrs. Kenerson as administrator) would have discharged drawer liability under 3-603. Another, and probably more reasonable, interpretation of the statute is that a check drafted in this manner would be payable to all of the representatives together, in the absence of an explicit authorization in fact or in some source of law outside the U.C.C. for each to act alone; but we need not and do not decide this issue. The trial court applied 3-110(1)(e) to the checks in this case, as if they had been drawn only to "Estate of Vaughan -13- 13 H. Kenerson." Since Fairbanks was a representative of the Estate, the court reasoned, the checks were payable to him under 3-110(1)(e). As we have stated above and explain further below, however, on the record in this case, the application of 3- 110(1)(e) to these checks was erroneous as a matter of law. Suppose, second, the checks had been made payable to "John C. Fairbanks & Jean R. Kenerson." Then the indorsements of both in their individual capacities would have been required to negotiate the checks under 3-116(b). See R.S.A. 382-A:3-116(b) ___ & comment. According to that provision, an instrument payable to two or more persons, if not in the alternative, is payable to all of them ("together," one may say) and may be negotiated only by all of them ("together"). See, e.g., Litchfield v. Pfeffer, 116 ___ ____ _____________________ N.H. 485, 487-88, 363 A.2d 413, 415 (1976) (holding that trial court properly found under 3-116(b) that notes payable to "Roy F. Litchfield and Gloria B. Litchfield or order" could be discharged only by both of them). Third, suppose the checks had been made payable to "John C. Fairbanks & Jean R. Kenerson, Administrators of the Estate of Vaughan H. Kenerson." Then the checks would have been payable to the named fiduciaries, according to 3-117(b), which provides that [a]n instrument made payable to a named person with the addition of words describing him . . . as any . . . fiduciary [other than an agent or officer of a specified person] is payable to the payee and may be negotiated . . . by him. See also R.S.A. 382-A:3-117(b), comment 2 (providing example of ___ ____ -14- 14 "John Doe, Administrator of the Estate of Richard Roe"). In this third type of case, in which the checks are payable to both but in their fiduciary capacities, under 3-116(b) the indorsements of both in their fiduciary capacities would be required to negotiate the checks. Accordingly, the indorsements of both in their fiduciary capacities would be necessary to invoke 3-603 to relieve the drawer of liability. "Persons," as the term is used in 3-116 and elsewhere in the statute, does not mean only "natural persons." This common sense interpretation of "persons" is reinforced by a statutory definition. R.S.A. 382-A:1-201(30) (defining person as including "individual" or "organization"). It is further reinforced by usage elsewhere in the statute and in judicial opinions. See R.S.A. 382-A:3-110(1)(e) (listing "an estate, ___ trust or fund" as possible "person[s]" that could qualify as payees); see also Equipment Distributors v. Charter Oak Bank, 379 ___ ____ ______________________ ________________ A.2d 682 (Conn. App. Sess. 1977) (two business entities); Alumax ______ Aluminum Corp. v. Norstar Bank, N.A., 572 N.Y.S.2d 133 (A.D.4 ______________ ___________________ Dept. 1991) (same). Thus, "persons" includes corporate fiduciaries and natural persons in their fiduciary capacities, as well as natural persons individually. The checks in this case appear most like those in the third of the categories described above. Except for the few instances in which the word "Administrators" was abbreviated to "Admin," the checks were made payable to the order of: Estate of Vaughan H. Kenerson Jean R. Kenerson & -15- 15 John C. Fairbanks Administrators It is true that the sequence of names on all the checks in this case is the reverse of the sequence in the third hypothetical category described above, in which the administrators were named first and the estate afterward. Appellees urge that we attach great significance to this difference in sequence. They contend that it was proper for the trial court to apply 3-110(1)(e) because the Estate appears first in the sequence. We do not interpret the statute as supporting this contention, and appellees do not cite a single case that suggests we should. A more reasonable interpretation is that 3-110(1)(e) is directed to cases in which the name of the estate is the only ____ name to appear. Comment 2 to 3-110 makes this point clear: 2. Paragraph (e) of subsection (1) is intended to change the result of decisions which have held that an instrument payable to the order of the estate of a decedent was payable to bearer . . . . The intent in such cases is obviously not to make the instrument payable to bearer, but to the order of the representative of the estate. R.S.A. 382-A:3-110, comment 2. Appellees also contend that the checks in this case should be subject to 3-110(1)(e) because the name of the Estate appears alone on the first line and is not connected by "and" or "or" to the names of its administrators. For several reasons, the argument is not persuasive. First, one would not expect to see "and" or "or" -16- 16 linking the name of an estate with its administrators because the addition of such language would ordinarily be both unnecessary and confusing. Accordingly, we decline to adopt, as an alternative reading of the checks, either (1) that they were payable to the Estate and Mrs. Kenerson and Fairbanks, or (2) ___ ___ that they were payable to the Estate or Mrs. Kenerson or __ __ Fairbanks. Nor does the absence of punctuation (whether a comma or a semicolon) between the first and second lines, strengthen significantly the argument for some alternative reading. Placing the name of the first named administrator on a separate line, ________ below the line on which the name of the Estate appeared and above the line on which "John C. Fairbanks Administrators" appeared, conveyed the message that she and the individual named on the next line, with "&" between them, were named as administrators and not as individuals. Second, we need not explore whether it would make a difference if Jean R. Kenerson had been named individually as a payee. She was not so named. Even the checks on which "Admin" rather than "Administrators" appeared are not subject to interpretation as naming her in her individual capacity. That reading is rebutted by the sequence in which the names appear -- on the first line, the Estate; on the second line, "Jean R. Kenerson"; and on the third line, "John C. Fairbanks Admin." If only Fairbanks were being named as administrator, common sense would reject the use of a sequence in which his name and designation as administrator were separated from the name of -17- 17 the estate by the name of another payee who was meant to be named only individually. Third, if we were to adopt the proposed interpretation of the statute, the result would be to give no effect to the drawer's manifested intent in naming the individuals as administrators only and not as individuals. For all these reasons, we conclude that 3-110(1)(e) does not apply to this case. Thus, the trial court erred when it read the checks as instruments controlled by 3-110(1)(e) rather than instruments controlled by 3-116(b) and 3-117(b). These sections together made plaintiff's indorsement essential to the proper negotiation of the checks under 3-202(1). Absent proper negotiation, payment to Fairbanks was not "payment . . . to the holder" under 3-603. Our conclusion derived from the text of the statute itself, absent New Hampshire case law in point, is confirmed by our examination of interpretations of the U.C.C. by the courts of other states and a respected commentator. A recent decision of the Massachusetts Supreme Judicial Court is closely analogous. In GMAC v. Abington Casualty ____ __________________ Insurance Co., 602 N.E.2d 1085 (Mass. 1992), the defendant issued _____________ to an individual a physical damage insurance policy covering a motor vehicle that the individual had purchased. Plaintiff GMAC was the holder of a security interest in the vehicle and was a loss payee beneficiary of that policy. When the vehicle sustained damage, defendant Abington issued a check payable to -18- 18 the order of the individual and GMAC. The check was delivered to the individual, who presented it to the drawee bank without GMAC's indorsement; the individual received full payment, and GMAC received none of the proceeds. The Supreme Judicial Court ("SJC") held that the payee, GMAC, could proceed against the drawer on the underlying contract claim, or under 3-804. Id. at ___ 1088-89. The SJC specifically observed that suit under 3-804 was not barred by 3-603 because the individual who cashed the check without GMAC's indorsement "was never a holder of the check." Id. at 1089. Since GMAC was named as a co-payee, ___ according to 3-116(b) the check could not be discharged by the individual payee acting alone. Id. at 1087-88. The SJC also ___ relied on 3-603, observing that without GMAC's indorsement, the purchaser of the vehicle could not have taken the check by negotiation and thus did not become a holder under 3-202(1). Id. at 1088. Without payment to a holder, the liability of ___ defendant was not discharged under 3-603. Id. In relation to ___ this issue, the case before us is in all material respects like GMAC v. Abington, though different in details not material to ____ ________ this issue. It is true that the SJC observed that GMAC and Abington were "not in an agency relationship," id. at 1087, and ___ appellees in this case have argued that Fairbanks was an agent for plaintiff. We hold, however, that in the absence of any evidence that plaintiff actually or apparently authorized Fairbanks to indorse and negotiate checks on her behalf, he was -19- 19 not an agent for indorsing and negotiating the Dean Witter checks. Thus, the present case, like GMAC v. Abington, is one in ____ ________ which for these purposes the payees were "not in an agency relationship." Id. at 1087. ___ In other but closely analogous circumstances, courts and commentators have adopted the same reasoning and come to the same conclusion as we do, namely, that payment on a missing or forged indorsement does not discharge a party from liability. White and Summers address, for example, the situation in which a thief, rather than a co-payee, steals order paper and forges the payee's indorsement. The thief who steals order paper cannot qualify as a holder, and the thief's signature is not an indorsement. White & Summers, 680 n.7. Subsequent takers, also, will not be holders. Id. at 680. Thus, when the drawee or maker ___ pays the presenter, the payor will not have paid a holder, no discharge under 3-603 will have occurred, and the original owner can recover on the stolen instrument under 3-804 or on the underlying obligation. Id. ___ The same result holds where an indorsement is missing, rather than forged. In a suit by the drawee bank against the collecting bank for accepting a check with a missing indorsement, a California appeals court noted that "[w]hen a check is made payable to two payees jointly, only proper negotiation, i.e., endorsement by both, results in the payment contemplated" by 3- 603. Feldman Construction Co. v. Union Bank, 104 Cal. Rptr. 912, ________________________ __________ 914 (Cal. Ct. App. 1972). That court also relied on 3-201, -20- 20 defining a holder, and 3-202, defining proper negotiation. It may be suggested that cases holding that a co-payee who absconds with funds is not a holder appear to be inconsistent with 3-603's reference to a "party who in bad faith pays or satisfies a holder who acquires the instrument by theft or who ____________________________________________________ . . . holds through one who so acquired it." R.S.A. 382-A:3- ____________________________________________ 603(1)(a) (emphasis added). The meaning of holder as it is used in this instance, appears, however, to be a deviation from the definition of the term in 1-201(20). Reading 3-603 together with 1-201(20), 3-202(1), and 3-116(b), one is driven to the conclusion that payment to a thief does not constitute payment to a holder for the purpose of discharge under 3-603. B. B. The trial court also relied on Protective Check Writers ________________________ Co. v. Collins, 23 A.2d 770 (N.H. 1942), interpreting that ___ _______ opinion as standing for the unqualified proposition (referred to here as the "single-entity rule") that the acts of one co- representative of an estate -- namely, Fairbanks -- are treated in law as the acts of the other -- namely, plaintiff. It is unclear whether the trial court, in its citation to the single- entity rule, meant that only Fairbanks' signature was necessary to negotiate the checks, or instead meant that under this rule Fairbanks was authorized to sign the indorsement of his co- administrator, plaintiff. To the extent that the trial court meant the former, we -21- 21 have already rejected the argument that under New Hampshire law Dean Witter was relieved of liability by paying on only one effective indorsement where two were required. Even if Protective Check Writers can properly be interpreted as standing ________________________ for the proposition that fewer than all co-administrators may negotiate an instrument made payable to all of them together -- and we do not decide whether it does -- it would be displaced by the provisions of the later-enacted statute. To the extent that the trial court relied on Protective __________ Check Writers for the proposition that Fairbanks, as _______________ administrator, was authorized in law to sign the indorsement of plaintiff, his co-administrator, we conclude that the statute displaces that purported rule also, even if we assume it did exist (in the form assumed by the trial judge) in earlier New Hampshire law. In analyzing the relationship between the statute and the common law that existed before its enactment, we start with not only the guidance of Town of Wolfeboro and Petition of Jane _________________ _________________ Doe, supra, but as well the legislative mandate that "unless ___ _____ displaced by the particular provisions of this chapter the principles of law and equity . . . shall supplement its provisions." See R.S.A. 382-A:1-103. Construing sections of the ___ statute in combination, as we must under Petition of Jane Doe, we ____________________ conclude that 3-116(b) and 3-117(b) leave no room for operation of the single-entity rule regarding commercial instruments. The statute is premised on an assumption that an -22- 22 instrument may be made payable to an estate, see R.S.A. 382-A:3- ___ 110(1)(e), or its fiduciaries, see R.S.A. 382-A:3-117(b). ___ Although both clauses are worded in the singular ("representative" in 3-110(1)(e), "named person" in 3-117(b)), and the illustrations in the comment to 3-117(b) include only one fiduciary, words in the singular number include the plural. See R.S.A. 382-A:1-102(5)(a). We need not decide, and do not ___ decide, whether, under 3-110(1)(e) and other relevant provisions, a check made payable to an estate alone can be negotiated on the indorsement of just one of its administrators. Where, however, a check is payable to two named administrators, not in the alternative, 3-116(b) declares that the instrument is payable to the two fiduciaries together, and is negotiable only by the two together. It would render 3-116(b) a nullity, at least with respect to checks made payable to co-administrators of estates, to hold that one of two or more co-administrators can, as a matter of law, sign the indorsements of fellow administrators and proceed to negotiate what is "negotiable only by all of them." Thus, 3-117(b) and 3-116(b), considered together, displace the common law single-entity rule. Appellees rely on a commentator's suggestion that the problem of who can indorse an instrument made payable to several administrators "will depend, as it did under prior law, on whether one personal representative has authority to act on behalf of the others . . . ." See Anderson, UCC 3d 3-116:31. ___ His premise, that "[t]he Code makes no provision in this -23- 23 respect," however, is subject to question. Perhaps it may be said that the Code does not do so in any single provision. But the Code, as just noted, explicitly allows for instruments payable to several persons together, and we see no reason not to apply 3-116 when the "persons" are individuals named in their capacity as fiduciaries. The rules of construction stated in the statute itself further strengthen this interpretation. The statute declares that it is to be "liberally construed and applied to promote its underlying purposes and policies." R.S.A. 382-A:1-102(1). One purpose of the statute is to "simplify, clarify and modernize the law governing commercial transactions." R.S.A. 382-A:1- 102(2)(a). Appellees have offered no reason to infer that, due to policy considerations unique to the administration of estates, either the drafters of the U.C.C. or state legislatures (including that of New Hampshire), in proposing and adopting 3- 116(b) and 3-117(b), manifested an intent to leave intact a common law single-entity rule, in those states where it existed or where no precedent existed one way or the other. Furthermore, though some recent cases in other jurisdictions continue to cite the single-entity rule, see, e.g., Holmes v. Lankenau Hospital, ___ ____ ______ _________________ 627 A.2d 763, 768 (Penn. Sup. Ct. 1993), a growing body of authority in the field of probate law (even if still a minority) rejects the rule. See Unif. Probate Code 3-717, 8 U.L.A. 340 ___ (1983) ("If two or more persons are appointed co-representatives and unless the will provides otherwise, the concurrence of all is -24- 24 required on all acts connected with the administration and distribution of the estate."). Our conclusion that the statute should be read as not preserving any purportedly pre-existing single-entity rule is further supported by the lack of any showing that this rule was ever firmly embedded in New Hampshire law. Appellees cite only one New Hampshire case, Protective Check Writers, supra, in __________________________ _____ support of their contention that the single-entity rule was and is now a part of New Hampshire law. The cited passage from Protective Check Writers, however, is a passing reference, not _________________________ essential to the basis of the decision, without citation to any other case, either in New Hampshire or elsewhere. The reference to the single-entity rule in the Protective Check Writers opinion was made in the process of _________________________ explaining the holding that each co-representative of an estate is liable for his or her own wrongdoing. 23 A.2d at 772. The court thus had no reason to be concerned with the very different question whether one co-representative has authority to bind the estate by action taken without the approval or even knowledge of the other. Moreover, the opinion in that case explicitly called attention to the fact that (1) "both administrators [in that case] were equally participants" in the transaction at issue, 23 A.2d at 772 ("making payments"), and (2) the issue before the court "was only the chargeability of Mrs. Ney, leaving [the chargeability] of her co-administrator undetermined." Id. We ___ conclude that Protective Check Writers does not support the _________________________ -25- 25 proposition for which appellees cite it. Appellees suggested in oral argument that the lack of reported New Hampshire cases regarding the single-entity rule indicates that the rule was so taken for granted by the New Hampshire bar that it was not the subject of litigation, or, more precisely, litigation that culminated in a reported opinion. The suggestion is unpersuasive in view of divided authority elsewhere and the interest litigants would have in presenting the issue in any case where it would be likely to affect the outcome. Finally, even if we were to assume, for the sake of argument, that New Hampshire had adopted the single-entity rule at a time before the New Hampshire legislature enacted the commercial code, this case falls within one of the "equitable exceptions" to the rule to which the opinion in Protective Check ________________ Writers referred. See id., 23 A.2d at 772. Because the rule _______ ___ ___ itself was not in issue, the court did not explain what these exceptions might be. The equities in the case before us would weigh strongly toward recognition of an exception, even if the single-entity rule were assumed to be part of the current law of New Hampshire. For the foregoing reasons, we conclude that we cannot determine that under the law of New Hampshire the trial court summary judgment for Dean Witter can be sustained on the basis of 3-603 and Protective Check Writers. ________________________ -26- 26 C. C. Even though payment to Fairbanks was not payment to a "holder" for purposes of 3-603, we conclude that Dean Witter is relieved of liability by a common law rule of agency that, we conclude, has been and continues to be part of the law of New Hampshire as in other jurisdictions. According to the Restatement (Second) of Agency, ______________________________ If an agent who is authorized to receive a check payable to the principal as conditional payment forges the principal's endorsement to such a check, the maker is relieved of liability to the principal if the drawee bank pays the check and charges the amount to the maker. Restatement (Second) of Agency 178(2) (1958). Although the ________________________________ Restatement refers to a "maker" rather than a "drawer," it is evident from the reference to a "drawee bank" that the rule applies to a drawer. No reported New Hampshire case has considered this rule. The modern trend in other jurisdictions, however, is consistent with the Restatement. Also, jurisdictions that have considered the question since enactment of the U.C.C. have held that this rule of the common law of agency survives under the U.C.C. Several cases have involved circumstances in which an attorney forged a client's indorsement on a check received from an alleged tortfeasor or the tortfeasor's insurance company in settlement of the client's tort claim. See Terry v. Kemper Insurance. Co., ___ _____ ______________________ 456 N.E.2d 465, 466-468 (Mass. 1983) (transfer to attorney, who was claimant's -27- 27 agent, of draft in the amount of claim drawn on account with sufficient funds, was "payment" within meaning of statute providing that unpaid party could commence action in contract for payments due over 30 days even though attorney forged client's indorsement); Navrides v. Zurich Insurance Co., 488 ________ _____________________ P.2d 637, 642-646 (Calif. 1971) (Restatement rule absolved defendant of all liability to plaintiff); Hutzler v. Hertz Corp., 347 N.E.2d _______ ____________ 627, 630-32 (N.Y. 1976) (in action for negligence of drawer, tortfeasor's obligation to claimant was discharged); Clarkson v. Selected Risks Insurance ________ _________________________ Co., 406 A.2d 494, 497-98 (N.J. Sup. Ct. ___ 1979) (defendant fulfilled insurance contract obligation and was not liable for negligence for forwarding settlement check to attorney who then forged client's indorsement); see also Liberty Mutual Insurance Co. ___ ____ _____________________________ v. Enjay Chemical Co., 316 A.2d 219, 222- __________________ 226 (Del. Sup. Ct. 1974) (adopting Restatement rule but not considering its relationship to U.C.C.; holding that defendant's payment of royalties to plaintiff's employee, who embezzled the funds, satisfied contractual obligation of royalty payment). In each case, upon determining that the attorney was an agent of the plaintiff who was authorized to receive the check drawn by defendant to plaintiff (and in some cases to the attorney as well), the court applied the rule as stated in the Restatement. In the absence of some explicit showing to the contrary, authority of a co-payee to receive a check seems apparent. Cf. __ Muzzy v. Rockingham County Trust Co., 113 N.H. 520, 523-24, 309 _____ ____________________________ A.2d 893, 895 (1973) (holding bank's delivery to husband of draft payable to husband and to wife together not actionable by wife because each, as co-payee, was entitled to possession). In this -28- 28 case, appellant concedes in her reply brief that Fairbanks was authorized to receive the Dean Witter checks on her behalf (in her capacity as administrator, we infer). She contends that the Restatement rule is not a good rule of law, and is moreover inconsistent with the U.C.C. Appellant cites to jurisdictions that she claims have repudiated, at least implicitly, the common law rule. See Morris v. Ohio Casualty Insurance ___ ______ ________________________ Co., 517 N.E.2d 904, 910 (Ohio 1988); ___ Smith v. General Casualty Co. of _____ ___________________________ Wisconsin, 394 N.E.2d 804, 806-807 (Ill. _________ App. Ct. 1979); Tormo v. Yormark, 144 U.C.C. Rep. _____ _______ Serv. 962, 967-972 (D.N.J. 1974). Only one of these courts, however, considered the rule; the others did no more than come to conclusions that the appellant argues are inconsistent with the rule. In fact, the results in these cases are entirely consistent with the common law rule stated in the Restatement. See Florida Bar v. Allstate Ins. Co., ___ ___________ _________________ 391 So.2d 238, 241 n.6 (Fla. App. 1981) (so reasoning). The cases concern the liability of insurance companies that, though both drawers and drawees (because they issue "payable through" checks and must approve the collecting banks' payment on them), are sued in their status as drawees. See Morris, 517 N.E.2d at 910; ___ ______ Smith, 394 N.E.2d at 806; _____ Tormo, 144 U.C.C. Rep. Serv. at 968 & n.6. _____ Dean Witter, of course, is not a drawee. Some jurisdictions, at one time at least, declined to apply the Restatement rule to a drawer. -29- 29 See M. Feitel House Wrecking Co. v. ___ ______________________________ Citizens' Bank & Trust Co., 106 So. 292 ___________________________ (La. 1925); Lawrence J. Kern, Inc. v. Panos, 177 _______________________ _____ So. 432 (La. App. 1937); Hart v. Moore, 158 So. 490 (Miss. ____ _____ 1935); compare Rodgers v. Fleming, 188 A. 861 _______ _______ _______ (Penn. 1937) (noting, but not holding, that drawer remains liable to a payee when check indorsement is forged) with Zidek v. West Penn. Power Co., 20 ____ _____ ____________________ A.2d 810 (Penn. Super. 1941) (holding plaintiff bound by settlement concluded by her attorney though attorney had forged her indorsement to the joint payee check and taken proceeds). Louisiana's decision not to discharge drawers of liability was necessary to preserve a remedy for aggrieved payees, since that jurisdiction, unlike New Hampshire, did not provide payees a cause of action against drawees and collecting banks. In any event, these decisions are unpersuasive in the face of carefully reasoned, recent decisions to the contrary by the highest courts of California, Massachusetts, and New York, see supra, and an ___ _____ array of added authorities. See, e.g., Strickland Transp. Co. v. ___ ____ _______________________ First State Bank of Memphis, 214 S.W.2d _____________________________ 934, 938 (Tex. 1948); Franciscan Hotel Co. v. Albuquerque ______________________ ___________ Hotel Co., 24 P.2d 718, 726 (N.M. 1933); _________ Mills v. Hurley Hardware & Furniture _____ _____________________________ Co., 196 S.W. 121, 121-22 (Ark. 1917); ___ McFadden v. Follrath, 130 N.W. 542, ________ ________ 544 (Minn. 1911); Patterson v. Southern Ry. Co., 151 _________ _________________ S.E. 818, 819 (Ga. App. 1930); Indemnity Mutual Marine Assurance Co. ______________________________________ v. Powell & O'Rourke Grain Co., 271 S.W. ____________________________ 538, 539-40 (Mo. App. 1925). Many of these court decisions advance cogent reasons for the position that one who authorizes an agent to receive a -30- 30 check should bear the risk that the agent is corrupt. Having chosen the agent in the first place, the principal is in a better position to prevent the loss than the drawer, who has had no say in the selection of the agent. Navrides, 488 P.2d at 643-44 (citation ________ omitted); Hutzler, 347 N.E.2d at 631. _______ To ask of commercial actors that they inspect every canceled check after it returns from the drawee bank for possible forgery "would make payment by check a matter of uncertainty and some risk." Navrides, 388 P.2d at 645 (citation ________ omitted); see also Hutzler, 347 N.E.2d at 630-31 ___ ____ _______ (same). It would be extremely expensive for business entities to look at the back of each returned check; it would be even more difficult for them to determine if the indorser was authorized by the creditor to indorse the particular check in question. Liberty Mutual Insurance Co., 316 A.2d at ____________________________ 224. Thus, a clear majority of the courts considering the issue have concluded that it is better to hold a creditor responsible for the choice of agent than to impose a burden on drawers that will raise the cost of commercial transactions. The result is not unduly harsh on the defrauded creditor, for whom a remedy is ordinarily available -- pursuing an action for conversion against the drawee bank. See Hutzler, 347 N.E.2d at ___ _______ 632. -31- 31 Appellant contends that the common law rule was displaced by UCC Articles 3 and 4. The U.C.C. provides, however, that "[u]nless displaced by the particular provisions of this chapter the principles of law and equity, including . . . the law relative to . . . principal and agent . . . shall supplement its provisions." R.S.A. 382-A:1-103. We conclude that the U.C.C. and the New Hampshire statute do not displace the common law agency rule. The U.C.C. and the New Hampshire statute do not contain "particular provisions" that provide for a cause of action by a payee against a drawer where a co-payee forges the payee's name and alone obtains the proceeds. Daniel E. Murray, Joint Payee ___________ Checks--Forged and Missing Endorsements, 78 Comm. Law J. 393, 399 _______________________________________ (1973). Section 3-804, it is true, allows a cause of action to be maintained by a payee against a drawer even when the payee does not qualify as a holder. Operation of that section, however, is based on the stated premise that the defendant drawer of the instrument is "liable thereon." Thus, 3-804 does not "displace" common law rules, such as the rule of agency at issue here, that are relevant to determining the liability of the drawer. The Supreme Judicial Court of Massachusetts has explicitly come to the same conclusion. In Terry v. Kemper, _____ ______ supra, the court adopted the Restatement rule as the law of _____ Massachusetts. A decade later, it held that a payee could sue a drawer -- under 3-804 or on the underlying contractual -32- 32 obligation -- where the instrument was drawn to the plaintiff and a co-payee and the drawer delivered the instrument to the co- payee, who absconded with the plaintiff's funds. See GMAC v. ___ ____ Abington Casualty Insurance Co., supra. In GMAC, the court _________________________________ _____ ____ distinguished Terry v. Kemper, because that case was one in which _____ ______ the absconding co-payee was authorized by the plaintiff to __________ receive the check on his behalf. 602 N.E.2d at 1087. Thus, the SJC reasoned that there was no inconsistency between recognizing, in general, a payee's cause of action against a drawer under 3- 804, and barring such an action where the instrument is delivered to an authorized agent. There is another, perhaps more plausible argument that 3-116(b) and 3-404 "displace" the common law rule in question. Section 3-116(b), the argument goes, requires the signatures of both principal and agent where they are both named as co-payees, as in this case. Section 3-404 provides that "[a]ny unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." 3-404(1). Appellant contends that the forged signature of a principal is "wholly inoperative," and therefore does not excuse the drawer from liability to the principal even after the drawer paid on the forged instrument that it delivered to the agent. See Muzzy v. Rockingham County Trust ___ _____ ________________________ Co., 113 N.H. 520, 523, 309 A.2d 893, 895 ___ (1973) (holding that where wife, without husband's authorization, signed husband's indorsement on draft, the instrument was defective under both 3-404 and 3-116); Morris, 517 N.E.2d at 909 (noting that ______ under 3-404 an unauthorized signature -33- 33 does not relieve drawer of obligation to pay payee). Several jurisdictions that have adopted the Restatement rule, however, have explicitly held that these sections do not displace the rule. See Terry, 456 N.E.2d at 467 ( 3-116(b) ___ _____ and 3-404); Hutzler, 347 N.E.2d at 630-32 ( 3-404); _______ Navrides, 488 P.2d at 643-646 ( 3-116(b) ________ and 3-404); Clarkson, 406 F.2d at 498 ( 3-116(b) and ________ 3-404). Indeed, it might plausibly be argued that 3-404 should be interpreted as allowing for the possibility that a person whose name is forged on an instrument by his agent is, by his unwise selection of the agent, "precluded from denying" the unauthorized signature. See Hutzler, 347 N.E.2d at 621 (stating that the ___ _______ court would, in principle, so hold). In any event, all of the jurisdictions that have considered whether that section or 3- 116, or both together, displace the common law rule have concluded that they do not. We conclude that summary judgment for Dean Witter is appropriate on the ground that appellant's action is barred by a rule of the common law of agency that remains a part of New Hampshire law after enactment of the commercial code by the New Hampshire legislature. IV. IV. Before the trial court, plaintiff claimed that drawee Banks were liable to her for conversion under 3-419(1)(c), which -34- 34 treats an instrument as converted when "it is paid on a forged indorsement." The Banks moved for summary judgment on the ground that Fairbanks' indorsement was valid and sufficient to justify their payment of the checks. The Banks relied on 3-301, defining the rights of a holder as follows: The holder of an instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in Section 3-603 on payment or satisfaction, discharge it or enforce payment in his own name. The trial court agreed that Fairbanks was a holder of the checks and could rightfully negotiate them with his indorsement alone, even though he forged Mrs. Kenerson's indorsement. A. A. As explained in Part III.A., Fairbanks was not a holder for the purpose of discharge of drawer liability under 3-603. ______ Here, the question presented is whether Fairbanks, acting alone, could exercise the powers of a holder under 3-301 in a manner that would discharge drawees of liability. We conclude here, _______ also, that Fairbanks could not, acting alone, exercise the powers of a holder -- in this instance for the purpose of invoking 3- 301. See GMAC, 602 N.E.2d at 1087 (considering 3-301 in ___ ____ reasoning to the conclusion that the co-payee who took payment on an instrument not signed by the other payee was not a holder). As explained above, this is the only reading consistent with other applicable statutory provisions. A holder's power of "negotiation" of an instrument under 3-301 depends, under 3- -35- 35 202(1), upon the holder's having obtained all "necessary" indorsements. In this case, as we have already established, 3- 116(b) renders "necessary" the signatures of both co-payees, in their fiduciary capacities. Indeed, to conclude that Fairbanks could alone negotiate the checks under 3-301 would practically nullify 3-116(b). The district court thus erred as a matter of law in granting summary judgment for the Banks based on 3-301. It follows, as well, that the district court erred to the extent that it relied on Jones v. Van Norman, 522 A.2d 503 _____ __________ (Pa. 1987), in holding that defendant Banks are not liable under 3-419(1)(c). In Jones, the agent was authorized to indorse her _____ principal's name to the checks she received for her principal and to deposit them in her principal's bank account. Id. at 505. ___ The court decided that, because the indorsements were authorized, they could not be the equivalent of forgeries for purposes of 3- 419(1)(c), even though the agent misappropriated the proceeds of the checks. In the present case, the Banks did not argue to the trial court, or to this court, that plaintiff authorized Fairbanks to indorse the checks; they rely, rather, on an assertion that he had inherent authority to do so. As just observed, however, Fairbanks' status as copayee did not confer on him authority to cash the checks without plaintiff's indorsement, or with a forged indorsement purporting to be hers. Similarly, his status as attorney and agent of Mrs. Kenerson for other purposes did not clothe him with authority to indorse the checks -36- 36 in her name. See Florida Bar v. Allstate Insurance ___ ___________ __________________ Co., 391 So.2d 238, 240 (Fla. App. 1981) ___ (adopting, in action for conversion where attorney forged client's indorsement on settlement check, the "majority" rule that an attorney specifically authorized to compromise a claim and collect the proceeds may not indorse the client's name on a check or draft tendered to effect the settlement); Morris v. Ohio Casualty Insurance Co., ______ ___________________________ 517 N.E.2d 904, 908 (Ohio 1988) (adopting this as "the better rule"). Finally, we have already rejected the argument that his status as co-administrator clothed Fairbanks with such authority. Consequently, Jones v. Norman is inapposite. _____ ______ B. B. Appellee Banks offer two alternative grounds for concluding that appellant cannot maintain a suit for conversion under 3-419. Neither, however, is sufficient to sustain summary judgment for the Banks. The Banks first contend that plaintiff cannot satisfy 3-419's requirement that a payee demonstrate that the instruments in question were delivered to her, because plaintiff never obtained physical possession of the checks. No New Hampshire court has addressed the existence and scope of the delivery requirement under 3-419(1)(c). We do not rest our decision on the New Hampshire legislature's revision of the statute, which now requires delivery to the payee before the payee can sue in conversion, see R.S.A. 382:3-420(a)(ii), because ___ -37- 37 it took effect after this dispute arose. We assume, as an initial matter, that the New Hampshire Supreme Court would find an implicit delivery requirement in 3- 419 and that it would recognize "constructive delivery." Most jurisdictions hold that a payee cannot recover from the collecting bank that pays on a forged indorsement if the check was never delivered to the payee. Papex Intern. Brokers v. Chase _____________________ _____ Manhattan Bank, 821 F.2d 883, 885 (1st Cir. 1987). Papex and ______________ _____ other decisions cited by defendant drawees concern the collecting __________ bank's liability in conversion rather than the drawee bank's ______ liability in conversion; however, this difference seems unlikely to be material to a delivery requirement. In any event, appellant concedes in her reply brief that the delivery requirement applies to suits against drawees as well and we assume, without deciding, that this is an accurate statement of New Hampshire law. Some courts recognize a constructive delivery where an intended delivery is thwarted, but a premise of invoking this rule is a showing, at minimum, that the drawer surrendered the instrument to the power of the payee or to some third person for the payee's use. Id. at 886; ___ see also Lincoln Nat. Bank & Trust Co. ___ ____ _____________________________ v. Bank of Commerce, 764 F.2d 392, 398 _________________ (5th Cir. 1985) ("actual or constructive delivery of the checks must occur"). In particular, delivery to a co-payee or agent of the payee has generally been assumed by courts to constitute constructive -38- 38 delivery. See, e.g., United States v. Bankers ___ ____ _____________ _______ Trust Co., 17 UCC Rep. Serv. 136 ___________ (E.D.N.Y.1975) (delivery to copayee); Burks Drywall v. Washington Bank & ______________ __________________ Trust Co., 442 N.E.2d 648 (Ill. App. __________ 1982) (delivery to copayee or agent); Thornton & Co. v. Gwinnett Bank & ________________ ________________ Trust Co., 260 S.E.2d 765 (Ga. App. 1979) _________ (delivery to agent); see also J. White & R. Summers, ___ ____ Uniform Commercial Code, 15-5, at 757 & _______________________ n.8 (3d ed. 1988) (delivery to co-payee, on grounds that co-payee is agent of __ other co-payees). The appellee Banks contend categorically in this case that the checks were never delivered to plaintiff. It is undisputed that plaintiff did not physically receive the checks, and the appellees also maintain that delivery to Fairbanks did not constitute constructive delivery to her. They insist, in particular, that appellant is foreclosed from arguing constructive delivery because such an argument contradicts her other contention that Fairbanks was not her agent with respect to negotiating the checks; and that, as a matter of law, delivery to the forger is not sufficient for 3-419. Appellant responds that physical delivery of the checks to Fairbanks, the forger, amounted to constructive delivery to her on two grounds -- that he was a co-payee of the checks, and that he was authorized as her attorney to receive them for her. We conclude that appellant has the better of the Banks on this question. It has already been established in an earlier portion of this opinion that Mrs. Kenerson and Fairbanks were co- payees in their capacity as co-administrators. Appellant -39- 39 conceded in another context, moreover, see supra, that Fairbanks ___ _____ was authorized to receive checks on her behalf, even though he was not authorized to indorse her signature. There is no contradiction in an attorney's being authorized to receive checks for a client, without being authorized to indorse the checks. See Morris, 517 N.E.2d at 980 ("The ___ ______ authority to receive a negotiable instrument on behalf of a client does not imply the power to endorse it."); Florida Bar, supra. ___________ _____ Moreover, there is authority for the proposition that a co-payee, like an employee, is an agent of the other co-payees for the __ purpose of receiving the check. See White & Summers, at 757. In ___ any event, if the agent receives the check, as co-payee or otherwise, and the agent procures payment over the forged indorsement of the payee, then the payee has a right to recover in conversion. White & Summers, at 757. This is a "conventional [case], grist for the check theft mill." Id. ___ The Banks' second proffered basis for holding that 3- 419 does not afford Mrs. Kenerson a remedy is that the checks reached their intended payee. It is quite true that no conversion occurs where the owner of a forged instrument receives the proceeds despite the forgery. Atlantic Bank of New York v. _________________________ Israel Discount Bank, Ltd., 441 N.Y.S.2d 315, 317 (N.Y. App. ____________________________ 1981). But "it cannot be said that the monies reached their intended destination when one intended beneficiary, the plaintiff, was deprived of any incident of ownership." True v. ____ Fleet Bank, 138 N.H. 679, 645 A.2d 671 (N.H. 1994). __________ -40- 40 In True, plaintiff sued the drawee bank for conversion ____ of the proceeds of a settlement check payable to plaintiff and her attorney; her attorney, without authorization, indorsed her name upon and deposited the check in a trust account. 645 A.2d at 671. The New Hampshire Supreme Court rejected defendant's contention that the funds reached their intended destination when they were deposited in an interest-bearing trust account for the benefit of plaintiff. Id. at 672. The court reasoned that "when ___ the defendant accepted the two-party check without the plaintiff's indorsement, it deprived her of her rights of ownership and placed the funds beyond her control." Id. ___ As we have already held that the checks in this case were payable to the co-administrators together, they were "two- party" checks as that term was used in True. We can see no way in ____ which this case is materially different from True. Furthermore, ____ appellees' contention -- that the checks reached their intended destination because they were deposited in the Estate account -- is merely another formulation of their argument, rejected above, that the checks were payable to the Estate, rather than to Fairbanks and plaintiff together as co- administrators of the Estate. Thus, no funds other than those that the district court determines on remand in fact reached plaintiff's hands-- including, but not necessarily limited to, the $20,000 to which she admits receiving--reached the intended payee. -41- 41 C. C. The final argument advanced by the Banks is that appellant's action for conversion is barred by her own negligence respecting the forgeries. The Code expressly provides for a negligence defense in defined circumstances: Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority . . . against a drawee or other payee who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. R.S.A. 382-A:3-406. The proffer of evidence before the trial court by appellee Banks in support of their motion for summary judgment fell short of meeting their burden of showing that no reasonable factfinder could find that they had failed to prove by a preponderance of the evidence that plaintiff was negligent and that her negligence "substantially contribute[d] . . . to the making of an unauthorized signature." We do not address what are the appropriate elements of a defense under 3-406 because that is a question better addressed in the first instance by the trial court, to which we remand for reasons explained below. D. D. Appellee Banks assert that summary judgment for -42- 42 appellant is inappropriate even if all legal issues are decided in her favor. The Banks have failed to identify precisely any disputed fact that is material to plaintiff's claim. We are concerned, however, that the trial court's erroneous allowance of the Banks' motion for summary judgment may have distracted attention from the fact that if the Banks wanted to press their contention, in the alternative, that the 3-406 defense should go to the factfinder, the Banks were entitled to a reasonable opportunity to proffer evidence that would support such a finding of fact. On the record before us, it is not clear that the Banks were appropriately notified that summary judgment might be entered against them as to this defense absent a proffer of admissible evidence to show the existence of a material dispute of fact on this issue. Thus, we will vacate the trial court's rulings on the cross-motions for summary judgment as to the Banks' liability and remand for such further proceedings, if any, as the district court deems appropriate before entry of final judgment. The judgment of the district court for Dean Witter is affirmed. ________ The judgment of the district court awarding summary judgment for Morgan Guaranty Trust Company and Bank of California, N.A., and denying plaintiff summary judgment as to liability against those parties, is vacated. The case is _______ remanded for any further proceedings, consistent with this ________ Opinion, the district court deems necessary and final disposition -43- 43 accordingly. Costs as to the claims against Dean Witter are awarded to Dean Witter against Kenerson. Costs as to claims against the Banks are awarded to Kenerson against the Banks. -44- 44