Nashua District Court
No. 79-398

*In re* RUSSELL C.

April 21, 1980

*Thomas D. Rath*, attorney general (*Betsy S. Westgate*, attorney, orally), for the State.

*Smith, Currier, Connor, Wilder & Lieberman P.A.*, of Nashua (*Jeffrey A. Zall* orally), for the defendant.

*Nancy J. Geiger*, Merrimack County juvenile advocate, and *Peter Stern*, by brief, as amicus curiae.

BOIS, J. This is an interlocutory appeal raising the issue of the statutory right to a "speedy trial" in the context of a juvenile proceeding. *Harkaway*, J. transferred without ruling this and other issues raised in the defendant's motion to dismiss because of their "general importance in the administration of juvenile justice throughout the State." We hold that RSA 169-B:14 II (Supp. 1979) and RSA 169-D:13 II (Supp. 1979) create a statutory right to speedy adjudication hearings wherein a juvenile is alleged to be "delinquent" or a "child in need of services," and remand.

On September 14, 1979, two juvenile petitions were filed in Nashua district court, alleging that the juvenile, Russell C., had in his possession marijuana, in violation of RSA 318-B:2 (Supp. 1979), and alcoholic beverages, in violation of RSA 175:8-a (Supp. 1979). The initial arraignment and appearance was held on both petitions on October 2, 1979. *Pantelas*, J. ordered the juvenile released to the

custody of his parents pending final disposition of the case, and scheduled the adjudicatory hearing for November 7, 1979. The issues raised by the juvenile's subsequent motion to dismiss were transferred here on November 20, 1979.

The juvenile first argues that the petitions were fatally defective for failure to specify whether he was alleged to be "delinquent" or "in need of supervision." Both petitions contained the statutory provisions violated as well as the necessary supporting facts, but failed to mark the appropriate box on the preprinted juvenile petition form, indicating whether the juvenile was:

( ) a delinquent child ( ) person in need of supervision
( ) a neglected child.

██ The purpose of a juvenile petition is to give the juvenile and his parents adequate notice of the substance of the proceedings. It is similar in this regard to a criminal complaint or indictment, and will be considered adequate if it informs the juvenile of the nature and cause of the accusation with sufficient definiteness to enable him to prepare for the proceeding. *See State v. Fields*, 119 N.H. 249, 253, 400 A.2d 1175, 1177 (1979). The petition will generally give sufficient notice to the juvenile when the charge follows the language of the statute and alleges all the necessary elements of the offense. *See State v. Manchester News Co.*, 118 N.H. 255, 257, 387 A.2d 324, 327 (1978), *appeal dismissed*, 439 U.S. 949 (1978).

█ Failure to specify whether the defendant was alleged to be delinquent or in need of supervision did not prejudice him here. The definitions of "delinquent" under RSA 169-B:2 II (Supp. 1979) and "child in need of services" under RSA 169-D:2 IV (Supp. 1979) do not overlap. It is clear that a juvenile petition alleging possession of marijuana under RSA 318-B:2 (Supp. 1979) is a delinquency petition because such an offense is "a felony or misdemeanor under the criminal code of this state if committed by an adult. . . ." RSA 169-B:2 II (Supp. 1979). It is similarly clear that a juvenile petition alleging possession of alcohol under RSA 175:8-a (Supp. 1979) is a petition alleging a child is in need of services because such possession by a person under the age of twenty years would be a violation under the criminal code of this state. RSA 169-D:2 IV (Supp. 1979). The petitions were therefore not fatally defective in this regard because they did not mislead or prejudice the juvenile in any way. However, we strongly recommend that

printed petition forms hereafter be fully completed or not used at all, in order to avoid unnecessary litigation.

■ The juvenile also argues that the petitions were fatally defective because they failed to allege that he was in need of counseling, supervision, treatment or rehabilitation. The statutes defining "delinquent" and "child in need of services" include substantially similar requirements that the juvenile so adjudged be expressly found to be in need of counseling, supervision, treatment or rehabilitation. We are of the opinion that the absence of specific allegations to that effect is not a fatal defect. The petitions alleged that the juvenile acted in such a manner as to "endanger his health or morals," and alleged the offenses charged and supporting facts with sufficient clarity to enable him to prepare for the juvenile proceedings without prejudice.

The principal issue we address is whether the petition must be dismissed if the adjudicatory hearing is not held within the times specified by the following statutes.

RSA 169-B:14 II (Supp. 1979) (delinquent children) provides:

> The adjudicatory hearing *shall be held* within 21 days of arraignment for minors detained pending such hearing and within 30 days of arraignment for minors not detained.

(Emphasis added.)

RSA 169-D:13 II (Supp. 1979) (children in need of services) provides:

> The adjudicatory hearing *shall be held* within 21 days of the initial appearance.

(Emphasis added.)

An appearance and arraignment was held on the juvenile petitions at issue on October 2, 1979, at which time the court released the juvenile to the custody of his parents and set the adjudicatory hearing for November 7, 1979. Although the petitions failed to classify the juvenile as either "delinquent" or "in need of services," the date set for the adjudicatory hearing was clearly outside the time limits prescribed by both RSA 169-B:14 II (Supp. 1979) and RSA 169-D:13 II (Supp. 1979).

The State argues that the use of the word "shall" in RSA 169-B:14 II (Supp. 1979) and RSA 169-D:13 II (Supp. 1979) is intended

to be directory and not mandatory. While conceding that the statutory provisions "appear to set mandatory time limits on the holding of the adjudicatory hearing," the State argues that a literal interpretation would be inconsistent with the purpose of the statutes. It further argues that the statutorily prescribed time limits are procedural and not jurisdictional in nature, and that a failure to comply is procedural error not requiring reversal absent a miscarriage of justice. We disagree.

■ The use of the word "shall" is generally regarded as a command; although not controlling, it is significant as indicating the intent that the statute is mandatory. *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935); E. CRAWFORD, STATUTORY CONSTRUCTION § 262 (1940); *see* 2A SUTHERLAND, STATUTORY CONSTRUCTION 57.03 (4th ed. C. Sands 1973); *accord United States v. Sanchez*, 574 F.2d 505, 507 (10th Cir. 1978). This is especially so where the purpose of the statute is to protect private rights. *Escoe v. Zerbst, supra* at 494; *see, e.g., South Carolina Wildlife Fed. v. Alexander*, 457 F. Supp. 118, 130 (D.S.C. 1978). We will give effect to the plain and ordinary meaning of the language used in a statute, *Corson v. Brown Products, Inc.*, 119 N.H. 20, 23, 397 A.2d 640, 642 (1979), unless such an interpretation would lead to an absurd, *State v. Slayton*, 116 N.H. 613, 615, 367 A.2d 575, 577 (1976), unjust, *In re Sargent*, 116 N.H. 77, 82, 354 A.2d 404, 407 (1976), or illogical result. *State v. Kay*, 115 N.H. 696, 698–99, 350 A.2d 336, 338 (1975). We will not give the language its literal meaning if it appears from the context of the statute that a different meaning was intended, *Town of Londonderry v. Faucher*, 112 N.H. 454, 457, 299 A.2d 581, 583 (1972), or if to do so would be inconsistent with the general purpose of the statute. *Blais v. Town of Goffstown*, 119 N.H. 613, 616, 406 A.2d 295, 297 (1979). Accordingly, we first examine the purpose of the statutes at issue and the consequences of interpreting the word "shall" in its ordinary sense.

RSA ch. 169-B (Supp. 1979) and RSA ch. 169-D (Supp. 1979) were enacted as part of Laws 1979, ch. 361, which was a comprehensive reorganization of RSA ch. 169, the statute dealing with abused, neglected and delinquent children, and children in need of services. RSA 169-B:1 (Supp. 1979) and RSA 169-D:1 (Supp. 1979) provide explicit guidance with regard to the purpose and applicability of those chapters. RSA 169-B:1 (Supp. 1979) provides in pertinent part:

This chapter shall be liberally interpreted, construed and administered to effectuate the following purposes and policies:

I. To encourage the wholesome moral, mental, emotional and physical development of each minor . . . , by providing him with the protection, care, treatment, counselling, supervision, and rehabilitative resources which he needs and has a right to receive;

II. Consistent with the protection of the public interest, to remove from a minor committing a delinquency offense the taint of criminality and the penal consequences of criminal behavior . . . ;

III. To achieve the foregoing . . . , whenever possible, by keeping a minor in contact with his home community and in a family environment . . . ; and

IV. To provide effective judicial procedures through which the provisions of this chapter are executed and enforced and which recognize and enforce the constitutional and other rights of the parties and assures them a fair hearing.

The objectives outlined in RSA 169-D:1 (Supp. 1979) are similarly focused:

I. To recognize that certain behaviors . . . indicate that a child is experiencing serious difficulties and is in need of services to provide him with the treatment, care, guidance, counselling, discipline, supervision, and rehabilitation necessary to assist him in becoming a responsible and productive member of society;

II. To recognize that . . . parents must be made aware of their contribution to . . . and . . . role in the solution of the problem;

III. To keep a child, whenever possible, in contact with his home community and in a family environment. . . .

The legislative history of Laws 1979, ch. 361 (formerly House Bill 831) provides additional insight into both the objectives and intent underlying the law's enactment.

. . . HB 831 is realistic and responsive to N.H. needs for

their children. *The objectives are one to clarify those portions of the present law which are vague, two, to insure internal consistencies between each section of chapter 169 and to address the due process rights of the juvenile established by the U.S. Supreme Court* in case decisions since 1967 *as well as to develop a juvenile code which addresses the concerns of all segments of the juvenile justice community. . . . While these revisions do not unduly restrict judicial discretion, they do provide for a more specific legislature* [sic] pronouncement as to the *course of juvenile justice in our state.*

(Emphasis added.) Senator Roy, N.H.S. JOUR. 1393, June 6, 1979. *See also* N.H.H.R. JOUR. 1840–41, April 30, 1979.

The statutes at issue represent a multifaceted approach to a complex problem. While the objectives are numerous and varied, the direction and focus of the new law is fairly clear. The legislature has acted to clarify preexisting law, guarantee children their constitutional rights, and encourage the use of rehabilitative and treatment resources whenever possible in a manner "[c]onsistent with the protection of the public interest." To interpret the word "shall" in its mandatory sense is consistent with these goals. *But see State v. Mullen,* 119 N.H. 703, 406 A.2d 698 (1979).

The State argues that a literal interpretation of "shall" would produce an illogical result by nullifying the central purpose of the statutes, which is to provide troubled juveniles with treatment. We disagree. The prescription of mandatory time limits on juvenile adjudicatory hearings under RSA ch. 169-B (Supp. 1979) and RSA ch. 169-D (Supp. 1979) is a legislative pronouncement of a child's right to the expeditious resolution of his alleged delinquency or "need for services" rooted in his right to due process, *In re Gault,* 387 U.S. 1 (1967), and is analogous to an adult offender's right to a speedy trial. We acknowledge that the primary goal of the new law is to treat and not punish, and that the 21/30 day "due process" requirements arguably defeat this goal when strictly applied, by letting juveniles "out on the street" who are in need of rehabilitation. However, we believe that this result was intended by the legislature, and do not find it absurd, unjust, or illogical.

While the laudable notion of *parens patriae* historically has been the rationale upon which our juvenile proceedings have been based, there is a growing concern that such a notion has resulted

in the child receiving the worst of both worlds: "that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." *Kent v. United States*, 383 U.S. 541, 555–56 (1966). There is a realization that the fond and idealistic hopes of juvenile court proponents and early reformers of generations ago have not been realized. *McKeiver v. Pennsylvania*, 403 U.S. 528, 543–44 (1970).

That the juvenile system has fallen short of the high expectations of its originators "in no way detracts from the broad social benefits sought or from those benefits that can survive constitutional scrutiny." *Breed v. Jones*, 421 U.S. 519, 529 (1975). The purposes and procedures delineated in RSA ch. 169-B (Supp. 1979) and RSA ch. 169-D (Supp. 1979) reflect the paramount concern for the welfare of the child and the desire to divorce juvenile proceedings from the criminal process whenever possible. The prescription of mandatory time limits, however, also reflects the concurrent legislative concern for procedural due process. The history of the juvenile court system has demonstrated that "unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure," and that "the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness." *In re Gault*, 387 U.S. 1, 18, 30 (1967).

Admittedly, a tension exists in affording juveniles procedural safeguards in the context of a "treatment oriented" proceeding.

> That the flexibility and informality of juvenile proceedings are diminished by the application of due process is not open to doubt. Due process standards inevitably produce such an effect, but that tells us no more than that the Constitution imposes burdens on the functioning of government and especially of law enforcement institutions.

*Breed v. Jones*, 421 U.S. 519, 535–36 n.15 (1975). This tension is unavoidable, however, and the balancing of priorities within the constraints of due process is primarily a legislative function. *See generally* Rector and Duizend, *New Directions for Juvenile Justice*, 39 Ohio St. L. Rev. 347 (1978); Gilman, *IJA/ABA Juvenile Justice Standards Project*, 57 B.U. L. Rev. 617 (1977).

Setting mandatory time limits on the holding of adjudicatory hearings is consistent with the goals of RSA ch. 169-B (Supp. 1979) and RSA ch. 169-D (Supp. 1979) and does not

produce an unintended result. *Cf. J.B.H. v. State*, 139 Ga. App. 199, 228 S.E.2d 189 (1976) (10-day time limit held mandatory). It is not our function to redraft legislation to make it conform to an intention not fairly expressed in the language of the statute. *Arnold v. City of Manchester*, 119 N.H. 859, 409 A.2d 1322 (1979). Accordingly, we conclude that the legislature intended that juveniles have a statutory right to a "speedy trial" in the context of an adjudicatory hearing in both delinquency and "child in need of services" proceedings. We hold that the time limits prescribed in RSA 169-B:14 II (Supp. 1979) and RSA 169-D:13 II (Supp. 1979) effectuate a substantive right requiring the court to forfeit jurisdiction if not complied with, unless such noncompliance is the result of a delay caused or requested by the juvenile, in which case he will be deemed to have waived the time limits. *See State v. Fraser*, 120 N.H. 117, 411 A.2d 1125 (1980).

We are concerned here only with the "speedy trial" rights accorded to juveniles alleged to be either "delinquent" or "children in need of services" and do not decide whether the time limitations prescribed by RSA 169-C:15 V (Supp. 1979) (abused or neglected children) effectuate a similar right. We note, however, that it is the juvenile's liberty interest that triggers the need for due process safeguards. Unlike the proceedings now before the court, a juvenile alleged to be abused or neglected under RSA ch. 169-C (Supp. 1979) is subject neither to a deprivation of his liberty in such a manner nor to a proceeding akin to a criminal trial. *See* RSA 169-B:19 (Supp. 1979), 169-C:19 (Supp. 1979), 169-D:17 (Supp. 1979).

It is not clear from the record below why the court scheduled the adjudicatory hearing for a date which clearly exceeded the statutorily prescribed limits. Because it is possible that the juvenile waived the time limits by causing or requesting a delay in the proceedings, we are unable to hold that the proceedings should be dismissed, and therefore remand for further proceedings consistent with this opinion.

*Remanded.*

All concurred.