NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

6th Circuit Court-Concord Family Division
No. 2021-0437

IN RE N.T.

Argued: March 17, 2022
Opinion Issued: July 20, 2022

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.

Belknap Legal Services PLLC, of Lakeport (Peter R. Brunette on the brief and orally), for Mother.

BASSETT, J. The respondent, the mother of N.T. (Mother), appeals orders of the Circuit Court (Cooper, M., approved by Kissinger, J.) entered during abuse and neglect proceedings regarding N.T. initiated by the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF), under RSA chapter 169-C (2014 & Supp. 2021). Mother argues that the trial court erred when it denied her motion to dismiss the abuse and neglect petitions. She asserts that, because the court failed to issue adjudicatory findings within sixty days of the filing of the petitions as required by RSA 169-C:15, III(d)

(2014), the court was divested of jurisdiction.  She also argues that the court erred when it found that she had physically abused and neglected N.T.  We affirm.

The following facts are supported by the record.  On April 10, 2021, an incident occurred involving Mother and N.T., who was then thirteen years old, during which Mother struck N.T. multiple times with a wooden cooking utensil, "checked" N.T.'s virginity by digitally penetrating her, and doused N.T. with lighter fluid and threatened to light her on fire.  Following the incident, Mother left the family's apartment and N.T. stayed in the care of her adult brother.

On April 16, DCYF filed three petitions pursuant to RSA chapter 169-C regarding N.T., alleging physical abuse, sexual abuse, and neglect by Mother arising out of the April 10 incident.  See RSA 169-C:3, II(d) (Supp. 2021) (physical abuse); RSA 169-C:3, II(a) (2014) (sexual abuse); RSA 169-C:3, XIX(b) (Supp. 2021) (neglect).  The trial court commenced the adjudicatory hearing on the petitions on May 17 and heard evidence for approximately ninety minutes.  See RSA 169-C:18 (Supp. 2021).  At the end of the time allotted for the hearing, in consultation with counsel, the court tried to find a time to resume the proceedings later that week.  Because counsel had limited availability, the court scheduled the hearing to resume for approximately two hours on May 20 and stated that it would find additional time in the schedule to conclude the hearing on a third day.

On May 20, the hearing resumed as scheduled.  Upon adjournment that day, the court estimated that the parties would need another three hours to complete the hearing and stated that the court would contact the parties to schedule the final hearing date.  The court notified the parties that the hearing would resume on June 17 — sixty-two days after the filing of the petitions.  See RSA 21:35 (2020) (providing general rule for computation of time period).  Counsel for one party was unavailable on June 17 and requested a continuance.  On June 21, sixty-six days after the filing of the petitions, Mother filed a motion to dismiss the petitions, arguing that, because the adjudicatory hearing had not been completed and written findings issued within sixty days of the filing of the petitions as required by RSA 169-C:15, III(d), and because the sixty-day time limitation in the statute is jurisdictional, the petitions should be dismissed with prejudice.  RSA 169-C:15, III(d) provides that:

> Upon a finding of reasonable cause that the child is abused or neglected, the court shall:
> . . . .
> (d) Set a date for an adjudicatory hearing.  In all cases, the adjudicatory hearing shall be held and completed and written findings issued within 60 days from the date that the petition was filed with the court.  If a child is in an out-of-home placement, the

adjudicatory hearing shall be held and completed within 30 days from the date the petition was filed with the court, unless the court makes a written finding of extraordinary circumstances requiring the time limit to be extended.

RSA 169-C:15, III(d) (emphasis added).

The court deferred ruling on this motion and, on July 16, recommenced the adjudicatory hearing, which lasted approximately two hours. On July 22, the court issued its adjudicatory order. It found that Mother had physically abused and neglected N.T., but dismissed the sexual abuse petition. The court also denied Mother's motion to dismiss under RSA 169-C:15, III(d), stating that "[t]he Clerk's office provided dates for these matters to be considered in a timely manner." Mother filed a motion for clarification and reconsideration, which the court substantively denied. This appeal followed.

I.   Motion to Dismiss Under RSA 169-C:15, III(d)

We first address Mother's argument that the trial court erred when it denied her motion to dismiss the petitions for failure to comply with RSA 169-C:15, III(d). DCYF and Mother agree that the sixty-day deadline in RSA 169-C:15, III(d) applies in this case, that the trial court did not complete the hearing or issue written findings within the sixty-day period, and that the time limit is mandatory rather than discretionary. The parties disagree, however, as to whether that sixty-day period is jurisdictional. Accordingly, the narrow issue before us is whether the failure of a trial court to hold the adjudicatory hearing and make written findings within sixty days of the filing of the petition divests the court of jurisdiction, requiring dismissal of the case.

Mother argues that the statute's plain language and its legislative history demonstrate that the time limit is intended to protect the due process rights of parents and children by guaranteeing a swift resolution of the proceedings, and, therefore, the statute must be construed as jurisdictional. She asserts that, because the trial court failed to comply with the sixty-day limitation, the court forfeited jurisdiction and should have dismissed the petitions. DCYF counters that the goals of the statutory scheme and the legislative history of RSA 169-C:15, III(d) show that the time limit was enacted "not to protect parents' liberty interests," but to "hasten adjudicative dispositions for the benefit of children," and that construing the time limit as jurisdictional would defeat that purpose. We hold that RSA chapter 169-C has multiple purposes that are advanced by the time limit in RSA 169-C:15, III(d): to protect the life, health, and welfare of the child, and to protect the rights of all parties involved in the abuse and neglect proceeding. Because construing the time limit as jurisdictional would undermine all of these important objectives, we conclude that the legislature did not intend that the court be divested of jurisdiction as a consequence of its non-compliance with the deadline.

3

Resolving this issue requires us to engage in statutory interpretation, and, accordingly, our review is de novo. See State v. Fournier, 158 N.H. 441, 445 (2009). In matters of statutory interpretation, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Petition of Carrier, 165 N.H. 719, 721 (2013). We interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. We consider words and phrases, not in isolation, but in the context of the statute as a whole in order to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. Id.

As an initial matter, we agree with the parties that RSA 169-C:15, III(d) establishes a mandatory time limit. The statute provides that the adjudicatory hearing "shall be held and completed and written findings issued within 60 days from the date that the petition was filed with the court," RSA 169-C:15, III(d) (emphasis added), and we regard the use of "shall" as "a command which requires mandatory enforcement," In re Christopher K., 155 N.H. 219, 229 (2007) (quotation omitted). However, as the parties recognize, this conclusion does not end our inquiry. "[W]e must next determine the appropriate mode of enforcement of the mandate." Id. (quotation omitted). When, as here, the statute itself does not provide a remedy for the court's failure to act within sixty days, see RSA 169-C:15, III(d), we look to the goals of the overall statutory scheme, and of RSA 169-C:15, III(d) in particular, to determine whether the legislature intended that the sixty-day deadline be enforced through a forfeiture of the court's jurisdiction. See Fournier, 158 N.H. at 447-49 (looking to statutory scheme's express purpose, as well as the language of the entire chapter, to discern legislative intent).

"Where the legislature, out of liberty interest concerns, has mandated time limits for holding hearings, we have held that personal jurisdiction over a [respondent] is lost, absent waiver, if the case is not heard within the statutory period." Id. at 447 (quotation omitted). For example, in In re Russell C., 120 N.H. 260 (1980), we observed that the mandatory time limits for holding adjudicatory hearings under RSA chapter 169-B (Supp. 1979) and RSA chapter 169-D (Supp. 1979) were "legislative pronouncement[s] of a child's right to the expeditious resolution of his alleged delinquency or 'need for services' rooted in his right to due process," and were intended to protect the child's liberty interest. Russell C., 120 N.H. at 266-68. We therefore held that the trial court's failure to act within those time limits divested it of personal jurisdiction over the child. Id. at 268; see also Fournier, 158 N.H. at 447-48 (concluding that mandatory time limits for holding hearing on petition for involuntary commitment were jurisdictional because statutory scheme evinced the legislature's intent to limit "unnecessary infringement on a person's liberty").

4

We will not, however, construe a time limit as jurisdictional when its purpose is to advance a "general interest in hastening adjudicative dispositions for the benefit of all parties involved." Appeal of Martino, 138 N.H. 612, 616 (1994) (concluding that time limit was non-jurisdictional, in part, because statute's purpose was to "speed the resolution of workers' compensation cases for the benefit of all parties involved"). Nor will we construe a time limit as jurisdictional when doing so would thwart the primary purpose of the statute. See In re Robyn W., 124 N.H. 377, 380-81 (1983) (declining to treat deadline for issuing order on petition to terminate parental rights as jurisdictional because doing so would defeat statutory objectives by penalizing the child's interest).[1]

Here, RSA chapter 169-C, also called the Child Protection Act (Act), states that "[i]t is the primary purpose of this chapter . . . to provide protection to children whose life, health or welfare is endangered." RSA 169-C:2, I (Supp. 2021); see RSA 169-C:1 (2014) (providing short title). A "further purpose" of the Act is "to establish a judicial framework to protect the rights of all parties involved in the adjudication of child abuse or neglect cases." RSA 169-C:2, II (Supp. 2021). Thus, the Act protects the child's life, health, and welfare, while also protecting the rights of all parties involved in abuse and neglect proceedings. See RSA 169-C:2 (Supp. 2021); In re D.O., 173 N.H. 48, 56 (2020).

Mother argues that we should construe RSA 169-C:15, III(d) as jurisdictional because the statutory purpose of protecting "the rights of all parties involved" demonstrates that the legislature's intent in enacting the statute was to protect: (1) the child's liberty interest as identified in Russell C.; and (2) the parents' liberty interests in raising and caring for their children. We disagree. First, Mother argues that Russell C. demonstrates that the legislature intended the sixty-day limit to protect children's constitutional due process rights. In Russell C., we emphasized that our conclusion — that the time limits for adjudicatory hearings in juvenile delinquency and children in need of services (CHINS) proceedings were jurisdictional — was premised upon the "juvenile's liberty interest," which triggered the need for due process safeguards. Russell C., 120 N.H. at 268. We also observed that one of the

---

[1] As we have previously observed, "[c]haracterizing mandatory time limits as 'jurisdictional,' though frequently done by courts, may often be more misleading than illuminating." Ruel v. N.H. Real Estate Appraiser Bd., 163 N.H. 34, 42 n.2 (2011); see also Arbaugh v. Y & H Corp., 546 U.S. 500, 510 (2006) (noting that, although the Court has referred to nonextendable time limits as "mandatory and jurisdictional," such time prescriptions "are not properly typed 'jurisdictional'" (quotation omitted)). We emphasize that, regardless of the terminology we use, the dispositive inquiry is one of legislative intent: whether the legislature intended that the court's failure to comply with the sixty-day limit would prevent the court from addressing the merits of the abuse or neglect petition at issue. See Ruel, 163 N.H. at 42 n.2.

original purposes of the 1979 enactment of RSA chapters 169-B, 169-C, and 169-D was to "address the due process rights of the juvenile." Id. at 265-66 (quotation and emphasis omitted).

As we explained in Russell C., the child's role and constitutional interest in juvenile delinquency and CHINS proceedings are different than they are in abuse and neglect proceedings. Id. at 268. Indeed, Mother acknowledges that the proceedings are fundamentally different: in abuse and neglect proceedings, the child is "the victim," and, in CHINS and delinquency cases, the child is "the perpetrator, and must be accorded most of the same constitutional protections extended to adult perpetrators in criminal proceedings." We are, therefore, unpersuaded that one of the legislative purposes of RSA chapter 169-C generally — and RSA 169-C:15, III(d) in particular — is protection of the child's liberty interest in avoiding physical restraint at issue in Russell C.[2]

As for parents' liberty interests, we have often recognized that parents have the "right to raise and care for [their] children," which is a "fundamental liberty interest protected by the State Constitution." In re C.M., 163 N.H. 768, 772 (2012). We agree with Mother that one of the purposes of RSA chapter 169-C is to protect this liberty interest. See RSA 169-C:2, II; see also RSA 169-C:2, III(c) (purposes of the Act should be carried out in a way that "recognize[s] and enforce[s] the constitutional and other rights of the parties and assures them a fair hearing"). We do not, however, agree with Mother that this means that the sixty-day limit is jurisdictional.

A parent's right to raise and care for her child is but one of the important rights protected by RSA chapter 169-C. We reiterate that the stated primary purpose of the statutory scheme is to protect the life, health, and welfare of endangered children. RSA 169-C:2, I ("The best interest of the child shall be the primary consideration of the court in all proceedings under this chapter."). A "further purpose" is to "establish a judicial framework to protect the rights of all parties involved" in the proceeding. RSA 169-C:2, II. The rights of "all parties" include the parents' liberty interests in raising and caring for their child, see RSA 169-C:2, III(c), as well as the child's interest in staying with, or being reunited with, her family unit, see RSA 169-C:2, III(b) (providing that, "whenever it is in the best interest of the child," a child should be kept "in contact with his or her home community and in a family environment by preserving the unity of the family"). The State likewise has an interest in "maintaining the parent-child relationship," D.O., 173 N.H. at 57, and is

---

[2] Because Mother's argument is limited to the liberty interest at issue in Russell C., we do not have occasion to decide whether the child has any liberty interest that is implicated in an abuse and neglect proceeding. Mother does not argue that, under either the State or Federal Constitution, a child has a liberty interest in being in the care and custody of her parents. See Suboh v. District Attorney's Office of Suffolk, 298 F.3d 81, 91 (1st Cir. 2002) (collecting cases supporting proposition that a child has a "liberty interest in being in the care and custody of her parents").

obligated to "[p]rovide assistance to parents to deal with and correct problems in order to avoid removal of children from the family," RSA 169-C:2, II(e). The State, the parents, and the child all also share an interest in proceedings designed to produce a "fair" and "correct" result. See C.M., 163 N.H. at 777.

Although these interests may, at times, be in tension, they are all advanced by the swift resolution of the adjudicatory phase of the proceedings. See In re Melissa M., 127 N.H. 710, 712 (1986) (noting "RSA [chapter] 169-C's emphasis on avoiding delay in child protection cases"); cf. In re Cierra L., 161 N.H. 185, 191 (2010) ("A quick disposition bears great importance . . . to ensure stability and resolution for all parties involved."). We therefore construe the statutory scheme as reflecting a legislative intent that the sixty-day limit protect the child's life, health, and welfare and the rights of all parties involved in an abuse and neglect proceeding, which encompass the interests discussed above. RSA 169-C:15, III(d) furthers these purposes by ensuring that abuse and neglect proceedings progress promptly with a view toward establishing a permanent placement that is in the best interest of the child while, at the same time, limiting undue interruption of, or restrictions upon, the parent-child relationship. See RSA 169-C:15, III(d). Because the statutory language is clear and unambiguous as to the purposes of the statutory scheme and RSA 169-C:15, III(d), we need not look further for indicia of legislative intent. See O'Donnell v. Allstate Indem. Co., 173 N.H. 295, 303 (2020). We therefore decline Mother's invitation to examine the legislative history of RSA 169-C:15, III(d).

Construing the sixty-day limit as jurisdictional would frustrate not only the statute's primary purpose of providing protection to children whose life, health, or welfare is endangered, see RSA 169-C:2, I, but also all of the aforementioned interests protected by the statutory scheme. If, as Mother argues in her brief, the failure of a court to comply with the sixty-day deadline were to result in dismissal of the abuse or neglect petition with prejudice, the child might well return to a situation that endangers her life, health, or welfare. Disposing of the abuse or neglect petition by dismissing it with prejudice on a technicality rather than resolving it on the merits would also frustrate the interests of the parents, the child, and the State in a proceeding that produces a fair and correct result. Such a disposition would be counterproductive: not only would it fail to vindicate "innocent" parents, because they would not obtain a finding of no abuse or neglect, but it would also leave abusive or neglectful parents and their children without the services and assistance they need from DCYF. See RSA 169-C:2, II(e). Given that RSA chapter 169-C is to be "liberally construed" to effectuate its purposes, RSA 169-C:2, III, we conclude that the legislature did not intend such a result, see RSA 169-C:2, III(c).

Alternatively, if, as Mother posited at oral argument, a case were to be dismissed without prejudice because the court missed the sixty-day deadline, a

similarly anomalous and perilous outcome would follow. In that circumstance, after dismissal, DCYF could immediately refile the abuse or neglect petition, which would, in effect, <u>delay</u> resolution of the proceedings by sixty days. This result would directly undermine the legislature's objective of hastening the resolution of abuse and neglect proceedings to achieve a permanent placement that is in the child's best interest. <u>See</u> <u>Appeal of Martino</u>, 138 N.H. at 616 (concluding that mandatory thirty-day deadline for Compensation Appeals Board to render decision was not jurisdictional, in part, because the outcome of vacating and remanding for a new hearing would undermine goal of hastening final resolution). Further, it would burden the interests of the parents, the child, and the State in maintaining the parent-child relationship by prolonging the time in which that relationship remains in limbo. <u>See</u> <u>McCarthy v. Wheeler</u>, 152 N.H. 643, 652 (2005) (Broderick, C.J., dissenting) (observing that dismissal and refiling of domestic violence petition would "tread even further on the interests of both the victim and the accused" by subjecting them to an additional thirty-day waiting period). Accordingly, because construing the time limit as jurisdictional would undermine the interests of all parties and thereby thwart the purposes of the statutory scheme — including the statute's primary purpose of protecting children whose life, health, or welfare is endangered — we conclude that the sixty-day mandatory limit in RSA 169-C:15, III(d) is not jurisdictional. <u>See</u> RSA 169-C:2; <u>Robyn W.</u>, 124 N.H. at 381; <u>cf</u>. <u>D.O.</u>, 173 N.H. at 58 (concluding that legislature did not intend a thirty-day statutory appeals period to be jurisdictional because "the primary purposes of the chapter would be thwarted if [that] were the case"). The trial court therefore retains jurisdiction over the abuse and neglect proceedings in this case.

This conclusion does not end our analysis. Mother may still be entitled to relief for the court's non-compliance with the deadline — but only if she demonstrates that she was prejudiced by the court's delay. <u>See, e.g.</u>, <u>Smith v. N.H. Bd. of Psychologists</u>, 138 N.H. 548, 551 (1994) ("In order to warrant a dismissal of the complaints, the plaintiffs, at a minimum, have the burden of showing prejudice due to the delay of the scheduled hearings."); <u>Robyn W.</u>, 124 N.H. at 381 (holding that we will enforce the mandatory time limit applicable to termination of parental rights proceedings by entertaining complaints against non-compliant trial courts unless "non-compliance is <u>de</u> <u>minimis</u>"). Here, Mother argues that she was prejudiced in that she suffered prolonged "emotional distress," was prohibited from "seeing or even talking with her daughter," and had to pay for a second apartment because she could not have contact with N.T. We are not persuaded.

As Mother acknowledges, she was criminally charged based on the same April 10, 2021 incident that gives rise to DCYF's abuse and neglect petitions. Pursuant to bail orders related to those criminal charges, she was prohibited from having contact with N.T. until the bail orders were modified in September

8

2021.  Because the trial court issued its adjudicatory findings on July 22, 2021
— well before the criminal no-contact order was lifted in September — Mother
would not have been able to have contact with N.T. notwithstanding the delay
in the abuse and neglect proceedings.  Mother has therefore failed to carry her
burden of proving prejudice and is not entitled to relief for the court's delay.
Accordingly, we conclude that the court did not err when it denied her motion
to dismiss.

Although we conclude that the sixty-day limit is not jurisdictional and
that Mother has not shown prejudice, our holding should not be construed to
diminish the significance of the sixty-day deadline.  We are mindful that there
are important and fundamental interests at stake in an abuse and neglect
proceeding and that all parties — especially the child — benefit from the
punctual administration of justice.  Accordingly, if an appellant can show
prejudice caused by a trial court's delay in completing the adjudicatory hearing
or issuing findings, we will not hesitate to employ an appropriate enforcement
mechanism, which may include exercise of our supervisory power under RSA
490:4 (2010).  See Robyn W., 124 N.H. at 381.

II.  Physical Abuse Finding

Mother next argues that the trial court erred when it concluded she
physically abused N.T.  She contends that, although there was evidence that
she struck N.T., there was insufficient evidence that N.T. was harmed by that
conduct; she therefore argues that the conduct did not constitute "abuse."  See
RSA 169-C:3, II(d).  In the alternative, she contends that, even if her conduct
constituted "abuse," it was justified under RSA 627:6, I, which provides a
justification defense allowing the use of force by a parent against a minor in
certain circumstances.  See RSA 627:6, I (2016).  Neither argument finds
support in the record.

When reviewing a finding of abuse or neglect, we will sustain the findings
and rulings of the trial court unless they are unsupported by the evidence or
tainted by error of law.  In re Tracy M., 137 N.H. 119, 125 (1993).  We defer to
the court's assessment of the evidence, see id., and view the facts in the light
most favorable to the court's decision, see In re Ethan H., 135 N.H. 681, 687
(1992).

Mother first contends that the abuse petition "was based solely upon
allegations that [Mother] had struck the child with a wooden . . . cooking
utensil" and that this conduct was inadequate to support a finding of "abuse."
To the contrary, the abuse petition, when read in conjunction with the attached
affidavit, alleges that N.T. was physically abused as defined by RSA 169-C:3,
II(d) based on all of Mother's conduct on April 10, including repeatedly striking
N.T. with the cooking utensil, digitally penetrating her, "slash[ing]" at her with

9

a knife, dousing her with lighter fluid, and threatening to light her on fire.  We consider evidence as to all of these allegations in assessing whether the record supports the court's abuse finding.

RSA 169-C:3, II(d) provides that an "[a]bused child" means "any child who has been . . . [p]hysically injured by other than accidental means."  We have interpreted this provision as requiring proof that "the alleged abusive act was committed under circumstances indicating harm or threatened harm to the child's life, health, or welfare."  Petition of Jane Doe, 132 N.H. 270, 277 (1989).  DCYF had the burden to prove its allegations of abuse by a preponderance of the evidence.  RSA 169-C:13 (2014).

Here, there is ample evidence in the record that Mother's abusive acts were "committed under circumstances indicating harm or threatened harm to [N.T.'s] life, health, or welfare."  Doe, 132 N.H. at 277.  The record demonstrates that Mother's conduct of striking N.T. resulted in physical injuries to N.T.: swollen knuckles, a small cut on her knuckles, "indentations" on her legs, and bruising on her thighs and shoulders.  Mother's behavior of striking N.T., which led to these injuries, was part of an ongoing course of conduct designed to "scare the truth out of" N.T.  Mother rapped N.T.'s knuckles and hit N.T.'s shoulder at the beginning of their interaction.  Then, after digitally penetrating N.T. to "check[] her virginity," Mother struck N.T. with the cooking utensil, then poured lighter fluid on N.T., held a burning hair bonnet over N.T., and threatened to set her on fire.  Additionally, at some point, Mother wielded "a large knife . . . as if she was going to cut" N.T.  This conduct constituted a direct threat of harm to N.T.'s life and health.  There was also evidence before the court that Mother's conduct harmed N.T.'s welfare: during the April 10 incident, N.T. was crying, shaking, and visibly scared.  And, as a result of the incident, N.T. engaged in self-harm and suicidal thoughts.

Arguing in favor of a contrary result, Mother relies on Ethan H. and Petition of Jane Doe, in which we reversed findings of abuse.  That reliance is misplaced.  Those cases are distinguishable in part because the physical injuries Mother caused N.T. and the circumstances under which she perpetrated them extend well beyond the injuries inflicted and the circumstances of those cases.  For example, in Ethan H., the child resumed play immediately after his mother struck and bruised him with a belt, Ethan H., 135 N.H. at 682, 687, and in Doe, the mother on two occasions struck her child and caused only "minor" bruising and a cut, Doe, 132 N.H. at 278.  Here, the record amply supports the trial court's finding of abuse under RSA 169-C:3, II(d).

Mother argues, in the alternative, that even if her conduct constituted abuse, it was justified under RSA 627:6, I.  That statute provides that: "A parent, guardian or other person responsible for the general care and welfare of a minor is justified in using force against such minor when and to the extent

10

that he reasonably believes it necessary to prevent or punish such minor's misconduct." RSA 627:6, I. DCYF counters that this statute does not apply to abuse and neglect proceedings, and even if it does, the facts do not support application of the justification defense in this case. We need not decide whether RSA 627:6, I, applies to RSA chapter 169-C proceedings, because we agree with DCYF that Mother's conduct did not fall within the scope of behaviors protected by the statute.

In order for the justification defense to apply, Mother must have reasonably believed her conduct necessary to prevent or punish N.T.'s misconduct. Id.; State v. Leaf, 137 N.H. 97, 99 (1993). "The operative word is 'reasonable,' which is determined by an objective standard." Leaf, 137 N.H. at 99. A belief that, although honest, is unreasonable, will not support the defense. Id.

Assuming, in Mother's favor, that N.T. actually engaged in misconduct, Mother points to no evidence in the record, and we have found none, that she reasonably believed that the force she used was necessary to prevent or punish that misconduct. And there was evidence from which the court could have concluded that Mother did not reasonably believe that the force she used was necessary. In fact, the record shows that Mother took steps to prevent others from learning that her conduct resulted in severe distress to N.T.: she locked her husband out of the apartment, closed an open window so that no one could hear N.T. screaming and crying, and urged N.T. to return to the apartment after the incident so that no one would hear N.T. crying and call the police. Thus, Mother's own behavior demonstrates that she was aware that the force she used was greater than reasonably necessary. See id. Additionally, there was evidence that other individuals viewed the force Mother used as greater than reasonably necessary. At the beginning of the incident, before Mother locked her husband out of the apartment, he intervened to stop Mother from continuing to strike N.T. with the cooking utensil. And, following the incident, N.T.'s adult brother told a DCYF worker that "the things that happened were not normal to his culture." For all these reasons, we conclude that the record supports the trial court's determination that Mother's conduct was not justified under RSA 627:6, I.

III. Neglect Finding

Finally, we address Mother's argument that the trial court erred in finding neglect because there was insufficient evidence that N.T.'s health suffered or is likely to suffer serious impairment. A "[n]eglected child" is defined, in relevant part, as:

> a child . . . [w]ho is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health,

11

when it is established that the child's health has suffered or is likely to suffer serious impairment; and the deprivation is not due primarily to the lack of financial means of the parents, guardian, or custodian[.]

RSA 169-C:3, XIX(b); see also RSA 169-C:13 (providing that the petitioner, here DCYF, bears the burden of proving neglect allegations by a preponderance of the evidence). "'Serious impairment' means a substantial weakening or diminishment of a child's emotional, physical, or mental health or of a child's safety and general well-being." RSA 169-C:3, XXVII-a (Supp. 2021). "Statutory neglect is not the actions taken or not taken by the parent or parents"; rather, "it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being," which are the conditions of neglect that must be repaired and corrected in the circuit court process. In re G.B., 174 N.H. 575, 581 (2021) (quotation and brackets omitted).

We will sustain the findings and rulings of the trial court unless they are unsupported by the evidence or tainted by error of law. Tracy M., 137 N.H. at 125. Contrary to Mother's argument that there was inadequate evidence that N.T.'s health suffered a serious impairment, the record reveals that, during the April 10 incident, N.T. was crying, shaking, and visibly scared. And, as a result of Mother's conduct, N.T. was "emotional and upset," engaged in self-harm, and was "feeling suicidal." This evidence is sufficient to show that a lack of proper parental care or control caused a "substantial weakening" of N.T.'s emotional and mental health, constituting a "serious impairment" to her health. RSA 169-C:3, XXVII-a. Accordingly, we conclude that the record supports the trial court's finding of neglect.

IV. Conclusion

In sum, we conclude that the trial court did not err when it denied the Mother's motion to dismiss the abuse and neglect petitions. Nor did it err when it made adjudicatory findings of physical abuse and neglect. Any issues Mother raised in her notice of appeal, but did not brief, are deemed waived. See State v. Blackmer, 149 N.H. 47, 49 (2003).

Affirmed.

MACDONALD, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.